# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00846-CV

**E. S., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 419TH JUDICIAL DISTRICT NO. D-1-FM-12-002643, HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an appeal from a district court order terminating the parental rights of E.S. to two children. In two issues on appeal, E.S. asserts that the evidence is legally and factually insufficient to prove that: (1) E.S. had committed one of the alleged statutory grounds for termination with regard to one of the children; and (2) termination was in the best interest of either child. We will affirm the termination order.

## BACKGROUND

The Texas Department of Family and Protective Services (the Department) brought suit to terminate E.S.'s parental rights to her two children, four-year-old J.L.H. and one-year-old M.Y. The case proceeded to a jury trial. The statutory grounds for termination that were submitted to the jury included that E.S. had: (1) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being

of the children; (2) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; and (3) constructively abandoned the children.[1] The jury was further instructed, consistent with the termination statute, that in order to terminate E.S.'s parental rights, it also had to find that termination was in the best interest of the children.[2] The jury found that E.S. had committed at least one of the grounds for termination with regard to each child and that termination was in the best interest of each child.

On appeal, E.S. does not challenge the sufficiency of the evidence supporting the jury's finding that she had committed one of the alleged statutory grounds for termination with regard to the youngest child, M.Y.[3] Instead, she argues that the evidence is legally and factually insufficient to support the jury's findings that she had committed one of the statutory grounds for termination with regard to the older child, J.L.H., and that termination was in the best interest of both children. We will review the evidence further below as it relates to those issues.

## STANDARD OF REVIEW

In a termination case, we ask whether the Department proved, by clear and convincing evidence, that the parent engaged in conduct that amounts to statutory grounds for termination and

---

[1] *See* Tex. Fam. Code § 161.001(1)(D), (E), (N).

[2] *See id*. § 161.001(2).

[3] At trial, the Department presented undisputed evidence that E.S. had used methamphetamine while she was pregnant with M.Y. In fact, E.S. admitted in her testimony that she had used methamphetamine while pregnant with that child.

2

that termination is in the children's best interest.[4]  Clear and convincing evidence is a heightened

standard of proof that requires "the measure or degree of proof that will produce in the mind of the

trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[5]

On appeal, we apply a standard of review that reflects this burden of proof.[6]

"In a legal sufficiency review, a court should look at all the evidence in the

light most favorable to the finding to determine whether a reasonable trier of fact could have

formed a firm belief or conviction that its finding was true."[7]  "To give appropriate deference to the

factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the

evidence in the light most favorable to the judgment means that a reviewing court must assume that

the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so."[8]

"A corollary to this requirement is that a court should disregard all evidence that a reasonable

factfinder could have disbelieved or found to have been incredible."[9]  However, "[t]his does not

mean that a court must disregard all evidence that does not support the finding."[10]  The reviewing

court must consider "undisputed facts that do not support the finding."[11]  "If, after conducting its

---

[4]  *See id*.; *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

[5]  Tex. Fam. Code § 101.007; *see C.H.*, 89 S.W.3d at 25.

[6]  *See In re J.F.C.*, 96 S.W.3d 256, 264-66 (Tex. 2002).

[7]  *Id*. at 266.

[8]  *Id*.

[9]  *Id*.

[10]  *Id*.

[11]  *See id*.

3

legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient."[12]

In a factual sufficiency review, "the inquiry must be 'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'"[13] We "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing," but we also "should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding."[14] "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient."[15]

## ANALYSIS

**Statutory termination grounds**

In her first issue, E.S. asserts that the evidence is legally and factually insufficient to support the jury's finding that E.S. had committed one of the alleged statutory grounds for termination with regard to J.L.H. The grounds submitted to the jury with regard to J.L.H. were engaging in conduct that endangered the child, placing the child in an endangering environment,

---

[12] *Id*.

[13] *Id*. (quoting *C.H.*, 89 S.W.3d at 25).

[14] *Id*.

[15] *Id*.

and constructive abandonment. Although multiple grounds were submitted to the jury in a standard broad-form question, the jury is required to find only one statutory ground in order to terminate parental rights.[16] For the reasons that follow, we conclude that the evidence is legally and factually sufficient to support the endangering-conduct ground.[17]

"Termination under subsection 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of [endangering] conduct by the parent is required."[18] "The requisite endangerment may be found if the evidence shows a parent's course of conduct that has the effect of endangering the child's physical or emotional well-being."[19] In this context, "endanger" has been broadly defined by Texas courts. Although "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury."[20] "Rather, 'endanger' means to expose to loss or injury; to jeopardize."[21] "Endangerment can occur

---

[16] *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *P.W. v. Department of Family & Protective Servs.*, 403 S.W.3d 471, 475 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd w.o.j.).

[17] *See* Tex. Fam. Code § 161.001(1)(E).

[18] *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied)).

[19] *Id.*

[20] *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (citing *Allred v. Harris Cnty. Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.)).

[21] *Id.* (citing Webster's New Twentieth Century Dictionary of the English Language 599 (1976)).

through both acts and omissions."[22]  "[T]he conduct does not have to cause a concrete threat of injury to the child."[23]  Nor does the conduct "have to occur in the presence of the child."[24]  "And the conduct may occur . . . both before and after the child has been removed by the Department."[25]  "If the evidence shows that the parent has engaged in a course of conduct which has the effect of endangering the child, then the finding under subsection E may be upheld."[26]  "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child."[27]  "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."[28]

---

[22] *In re W.J.H.*, 111 S.W.3d 707, 715 (Tex. App.—Fort Worth 2003, pet. denied) (citing *Phillips v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 354 (Tex. App.—Austin 2000, no pet.)).

[23] *Id*. at 716 (citing *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.); *Director of Dallas Cnty. Child Protective Servs. Unit v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no pet.)).

[24] *Walker v. Texas Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Bowling*, 833 S.W.2d at 733).

[25] *Id*. (citing *In re S.M.L.D.*, 150 S.W.3d 754, 757-58 (Tex. App.—Amarillo 2004, no pet.); *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no pet.)).

[26] *W.J.H.*, 111 S.W.3d at 716 (citing *D.M.*, 58 S.W.3d at 811).

[27] *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) (citing *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied)).

[28] *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (citing *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.); *Toliver v. Texas Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 98 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *R.W.*, 129 S.W.3d at 739); *see also Walker*, 312 S.W.3d at 618 ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E).").

In this case, the Department presented evidence tending to show that E.S. had used methamphetamine on multiple occasions. E.S. admitted in her testimony to using methamphetamine while pregnant with M.Y., although she denied using it in the presence of J.L.H. E.S. claimed that she did not start using methamphetamine until after the Department's investigation had begun and that she had used it as a "coping" mechanism to deal with the stress of that situation. When asked how often she had used methamphetamine, E.S. testified, "I don't use it anymore. But when I did do it, I only did it—I mean, I didn't smoke every day." E.S. denied that she had a drug problem. However, at the time E.S. had used methamphetamine, the Department's case against her was ongoing. Thus, E.S. had used methamphetamine despite the fact that her parental rights were at risk at the time. From this evidence, the jury could have rationally inferred that E.S. had a pattern of methamphetamine use that endangered J.L.H.'s physical or emotional well-being.[29]

Additionally, although E.S. claimed that she had only used methamphetamine "two or three times," the jury could have rationally concluded that she had used it more frequently than she claimed. Dr. Ernest Lykissa, the Department's expert witness on intoxication, testified that on multiple occasions, hair-follicle tests were performed on E.S. that revealed the presence of high levels of methamphetamine in her body. According to the drug-test results, E.S. first tested positive for methamphetamine on June 4, 2012. Dr. Lykissa testified that the test results indicated that E.S.

---

[29] *See In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) ("A parent's decision to engage in illegal drug use during pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being."); *In re C.A.B.*, 289 S.W.3d at 885 ("Methamphetamine has potential for abuse and has 'addiction-forming liability' as a narcotic.").

had used methamphetamine frequently during the previous ninety days.[30] E.S.'s hair again tested positive for methamphetamine on August 27, 2012, in an amount that indicated, according to Lykissa, "about 12 times higher than a casual exposure." In Lykissa's opinion, this meant that E.S. "probably did a few frequent doses" during the previous thirty days and that such an amount could not, in practice, result from one-time use. In Lykissa's view, if the amount present in E.S.'s hair had resulted from one-time use, E.S. would likely be dead.

Additional drug tests produced mixed results. On January 24, 2013, E.S.'s urine tested positive for methamphetamine and, on February 20, 2013, her urine tested positive for marihuana. However, on January 29, 2013, both a hair and urine test were negative.[31] But, in August 2013, hair-test results again were positive for methamphetamine, this time over the previous ninety-day time period. Once again, the amount of methamphetamine in E.S.'s hair was so high that it could not, in Lykissa's opinion, have resulted from one-time use. According to Lykissa, "[S]he would have died for sure" if the amount had been from a single dose. He added, "She had to use

---

[30] According to Lykissa, a hair-follicle test measures drug use over an extended "window" of time, because it takes longer for drug residue to be present in hair growth following use. For example, the June 4 test measured E.S.'s drug use over the previous ninety days (other hair tests that were performed on E.S. measured use over shorter time periods, such as thirty days). In contrast, blood and urine tests reveal more recent use. Lykissa explained:

> Well, any part of the body you test for drugs, it will give you a different window, I mean, or a look back, if you would like, of somebody that has used. The hair, as I said, it gives you a look back, and it's not exact. I mean, if you tell me, did this person use—you know, I mean, I'm testing them now. And did this person use [on] August the 12th, I cannot tell you that in the hair. But if I test him on August the 12th or August the 13th in their bloodstream, I would find it because it's still in their bloodstream. If a week later I test them in their urine, I would find it. In the hair, I have to wait a month, you know, to test them, and then I'll get it.

[31] E.S.'s urine had also tested negative on November 7, 2012 and May 21, 2013.

8

multiple times, and something tells me, with the amount involved here, she had to do it periodically during that 90-day period." Moreover, there was also evidence presented that E.S. had missed drug tests on numerous occasions during the past year,[32] which, the jury could have rationally inferred, meant that E.S. knew that she would test positive for illegal drugs on those dates and had avoided taking the tests for that reason.[33]

In her brief, E.S. emphasizes that there was no evidence tending to show that she had used methamphetamine while J.L.H. was in her presence, because the positive drug tests occurred only after the Department had removed J.L.H. from her care. However, evidence of drug use while the child is in the parent's care is not required to support an endangerment finding, so long as the evidence shows that the parent had used illegal drugs while the case was ongoing.[34] Here, the Department presented ample evidence of E.S.'s drug use while the case was ongoing, summarized

---

[32] A summary of the drug-test results were admitted into evidence. The results show 31 dates marked "no show" and two dates marked "refused." Both of the "refused" dates were hair-follicle tests, while the "no shows" included both hair and urine tests. In her testimony, E.S. provided various excuses and explanations for the missed tests, including problems obtaining transportation to the testing site. However, the jury was free to disbelieve E.S.'s testimony, and we are to defer to the jury's credibility determination.

[33] *See, e.g.*, *C.A.B.*, 289 S.W.3d at 885 ("A factfinder reasonably could infer that [parent's] failure to submit to the court-ordered drug screening indicated she was avoiding testing because she was using drugs."); *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (same).

[34] *See, e.g.*, *In re C.J.S.*, 383 S.W.3d 682, 689 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *M.E.-M.N.*, 342 S.W.3d at 263; *Walker*, 312 S.W.3d at 617-18; *In re S.K.A.*, 236 S.W.3d 875, 901 (Tex. App.—Texarkana 2007, pet. denied); *Cervantes-Peterson v. Texas Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also* *C.A.B.*, 289 S.W.3d at 885 (mother endangered well-being of child by, among other things, "continu[ing] to engage in criminal activity" even though she "knew her parental rights were in jeopardy"); *Robinson v. Texas Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 687 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (same).

above. Viewing that evidence in the light most favorable to the jury's finding, we conclude that the evidence is legally sufficient to prove that E.S. had engaged in a course of conduct that had the effect of endangering J.L.H.'s physical or emotional well-being.

We reach the same conclusion after giving due consideration to the disputed evidence in the case. There was disputed evidence as to the extent of E.S.'s drug use: E.S. had tested negative for drugs on at least three occasions; E.S.'s licensed chemical-dependency counselor testified that she believed E.S. was no longer using illegal drugs and that she "would be surprised" if E.S. currently tested positive for drug use; and E.S. claimed in her testimony that she had stopped using methamphetamine by the time of trial. Nevertheless, there was evidence tending to show that E.S.'s hair had tested positive for methamphetamine as recently as August 2013, approximately two months prior to trial, and this evidence tended to show that E.S. had used methamphetamine on multiple occasions during that summer. In light of the entire record, we cannot say that "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that E.S. had endangered J.L.H.'s physical or emotional well-being by using illegal drugs. Accordingly, we conclude that the evidence is also factually sufficient to support the jury's finding. We overrule E.S.'s first issue.

**Best-interest finding**

In her second issue, E.S. asserts that the evidence is legally and factually insufficient to support the jury's finding that termination of her parental rights was in the best interest of both children. When deciding the best-interest issue, we consider the well-established *Holley v. Adams*

10

factors, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the party seeking custody, programs available to help that party, plans for the child by the party seeking custody, the stability of the proposed placement, the parent's conduct indicating that the parent-child relationship is improper, and any excuses for the parent's conduct.[35] The Department need not prove all of the *Holley* factors as a "condition precedent" to termination, and the absence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination is in a child's best interest.[36] "The need for permanence is the paramount consideration for the child's present and future physical and emotional needs."[37] Moreover, a parent's statutorily offensive conduct is often intertwined with the best-interest determination.[38]

We begin with E.S.'s statutorily offensive conduct. Again, by E.S.'s own admission, she had used methamphetamine while she was pregnant with M.Y. There was also evidence, summarized above, tending to show that she had a pattern of methamphetamine use that endangered J.L.H., as demonstrated by her continuing to use the drug while the case was ongoing and her parental rights were at risk.

---

[35] *See* 544 S.W.2d 367, 371-72 (Tex. 1976).

[36] *C.H.*, 89 S.W.3d at 27.

[37] *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ).

[38] *Horvatich v. Texas Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601 (Tex. App.—Austin 2002, no pet.) (citing *Holley*, 544 S.W.2d at 372; *Leal v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 315, 321 (Tex. App.—Austin 2000, no pet.)).

Moreover, the Department presented additional evidence of statutorily offensive conduct other than drug use. E.S. had, on one occasion, placed J.L.H. in the care of her uncle, Thomas Scott, who had appeared to be intoxicated at the time.[39] According to Corporal Jerry Thyssen of the Pflugerville Police Department, the officer who had investigated the incident, bystanders had found Scott in what appeared to be an intoxicated condition, walking J.L.H. in a stroller through a field or hike-and-bike trail near a roadway. Thyssen testified that he had observed numerous indicators of intoxication when he encountered Scott, including difficulty standing and slurred speech, and that Scott had admitted to consuming "somewhere between two to three 24-ounce [high-alcoholic-content] beers . . . within the 30, 40 minutes prior to [Thyssen] coming into contact with him." Thyssen explained that in the condition Scott was in at the time he was found, Scott had presented a danger to the child's safety:

> [W]ith Mr. Scott's level of intoxication, there's no way that he could have properly cared for the child. . . . Mr. Scott could barely keep his balance, and he had walked into the roadway. And several construction workers working on a house nearby actually went over to get the stroller from Mr. Scott to protect the child, so he was in no condition to care for a child, especially out in a public place like that.

E.S. claimed that her uncle was merely suffering from serious complications related to diabetes at the time of the incident, but, even if that was the case, the jury could have rationally inferred that E.S. had exercised bad judgment in placing her young child alone with an individual who was

---

[39] This was some of the conduct that formed the basis for the Department's endangering-placement allegations. *See* Tex. Fam. Code § 161.001(1)(D).

seriously impaired and that such judgment reflected poorly on her ability to keep her children safe.[40]

On another occasion, the police had found J.L.H. wandering alone on a roadway. When police

returned J.L.H. to his home, E.S. was asleep and had been unaware that J.L.H. had gone missing.

From this evidence, the jury could have rationally inferred that it would be in the best interest of the

children not to reside with a woman who could be unaware if her children ever went missing.

Additionally, E.S.'s current live-in boyfriend (and the father of M.Y.) was also

an admitted methamphetamine user, and E.S. had what was characterized by one witness as a

"very close relationship" with this man.[41] Thus, the jury could have rationally inferred that if E.S.

maintained her parental rights, the children would be raised in a family with two methamphetamine

users, which could be detrimental to the children's well-being. As Louis Rishkofski, a licensed

marriage and family therapist who had counseled J.L.H. during the case and who testified for the

Department, explained:

> [O]ne of the things that happens when substance abuse enters the family, is that there is a draw by that addictive element of energy, of emotions, of just physical resources out of the family . . . . [T]he children end up not getting the energy or the resources that are going to that addictive habit, and so they either have to sort of provide for themselves.

---

[40] E.S. claimed that she did not know her uncle was impaired when she left J.L.H. in his care. The jury was free to disbelieve this testimony.

[41] The father, whose parental rights to M.Y. were also terminated in the same proceeding below, had similarly tested positive for methamphetamine on multiple occasions. He admitted in his testimony that methamphetamine had been a "pretty serious habit" for him in the past, although he denied currently using the drug. He had also admitted to using cocaine and marihuana in the past. The father has not appealed the judgment terminating his parental rights.

13

Rishkofski added that methamphetamine is a "fairly powerful addictive drug" and "highly stimulating" and that, in his experience, it would be "difficult" for a parent who is using methamphetamine to care for a child. He explained:

> [O]ne of the things that happens with stimulants is that they—you are sort of energized and you're putting out energy, and it sometimes may make noticing things around you a little more difficult or being able to listen because you will tend to want to be talking all the time. . . . [I]f you use a stimulant and if you use it for several days, then there will be a crash in which you'll sleep for an inordinate amount of time usually.

The jury could have rationally inferred from this evidence that it would be in the best interest of the children to not be raised in such an environment.

Furthermore, E.S. had missed several scheduled visits with her children while the case was ongoing.[42] There was evidence tending to show that, by missing these appointments, E.S. had caused J.L.H. significant emotional distress. According to Rishkofski, J.L.H. felt "abandonment" and "a sense of loss" following the missed visits. Rishkofski explained:

> The inconsistency is very difficult because he either gets his hopes up or starts to wonder, and then he sees them, and then he gets excited, and then he doesn't again see them in a long time. And, you know, with kids, predictability is, you know, part of the important structure of their life.

---

[42] This was the conduct that formed the basis of the Department's constructive-abandonment allegations. *See* Tex. Fam. Code § 161.001(1)(N). E.S. claimed that difficulties finding transportation were primarily responsible for the missed appointments, but the Department presented evidence that transportation options, such as taking the bus, were available to her.

14

The jury could have rationally inferred from this and other evidence that it would be in the best interest of the children to not subject them to the emotional distress that would follow if E.S. remained "inconsistent" in her parenting, either because of her own drug problem or her boyfriend's drug problem, both of which, the jury could have rationally inferred, remained ongoing concerns.

In contrast, the jury could have rationally inferred that no such concerns were present with the Department's proposed placement for the children. At the time of trial, both J.L.H. and M.Y. had been placed in the care of Beth and Nathan Feger, both of whom testified that they loved and wanted to adopt the children. The Fegers testified that the children were comfortable in their home, that J.L.H. had developed an especially close bond with Mr. Feger and that both children had a positive relationship with their own eight-year-old son and treated him like a sibling. The Fegers also described in detail the ways in which they were active and involved in the children's lives. According to Mrs. Feger, J.L.H. calls her "mom or mama or mommy, and he calls Nathan dad." Additionally, the Fegers testified that the children were getting regular medical care under their supervision and that J.L.H. was attending and enjoying school and continuing to receive therapy. Based on this and other evidence, the jury could have rationally inferred that the Fegers would be a more stable and beneficial placement for the children.

The Court Appointed Special Advocate (CASA) and guardian ad litem for the children, Jennifer Horton, testified that when she was first assigned the case, the children had already been placed with the Fegers and that she had observed that the children "were doing well" with the Fegers. She added, "The children seemed healthy and peaceful." Horton further testified that she had observed several visits between E.S. and the children and that, during those visits, J.L.H.'s

behavior "was quite sporadic," while there did not appear to be much "attachment" or "engagement" between E.S. and the infant, M.Y. Horton also testified that she believed it was in the best interest of the children to have E.S.'s parental rights terminated. She explained:

> I have three primary concerns. In the 17 months that this case has gone on, there has been established consistent positive drug tests for the parents. The parents have had an opportunity to participate in services to address drug use, and they have not completed those services. I also have concern that in the time I've been on the case, they've missed over 30 opportunities to visit with their children.

Similar testimony regarding the best interest of the children was elicited from the CPS caseworker assigned to the case, Michelle DeHaven. DeHaven concluded that E.S.'s parental rights should be terminated because the children "need a stable, predictable, loving, safe home that they can stay in . . . for the rest of their childhood, the rest of their lifetime. . . . They need to have that—that stability and permanency." DeHaven did not believe that E.S. would be able to provide the children with such stability. Viewing the above evidence in the light most favorable to the jury's finding, we conclude that the evidence is legally sufficient to prove that termination of E.S.'s parental rights was in the best interest of the children.

We reach the same conclusion after giving due consideration to the disputed evidence in the case. There was disputed evidence regarding the desires of J.L.H. Although there was evidence tending to show that he had bonded with the Fegers, there was other evidence tending to show that he still loved his mother and wanted to remain in her care. Although J.L.H. did not testify, several witnesses, including witnesses for the Department, testified that J.L.H. clearly loved his mother, became upset when his visits with her would end, and expressed a desire to go home

16

and live with her. Additionally, E.S.'s individual therapist, Melinda Parker, testified that E.S. was making efforts to improve herself through therapy and become a better parent and had, in her opinion, overcome her drug problem. Finally, E.S. provided testimony from which the jury could rationally infer that, despite her drug problem, E.S. loved her children and cared about their well-being. Although the testimony of E.S. and her therapist and the apparent desire of J.L.H. to be reunited with his mother provide some evidence that termination of E.S.'s parental rights might not have been in the best interest of the children, we cannot say, in light of the other evidence summarized above, that "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that termination of E.S.'s parental rights was in the best interest of the children. Accordingly, we conclude that the evidence is also factually sufficient to support the jury's finding. We overrule E.S.'s second issue.

## CONCLUSION

We affirm the district court's order terminating the parental rights of E.S.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed: May 30, 2014

17