

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 02-15-00147-CV

IN THE INTEREST OF T.G., L.G.,
AND M.G., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-99403J-13

----------

## MEMORANDUM OPINION[1]

----------

Tamara Grant appeals from the trial court's judgment terminating her parental rights to her children, Tommy Grant, Luke Grant, and Mary Grant.[2] We affirm the trial court's judgment. *See* Tex. R. App. P. 43.2(a).

---

[1]*See* Tex. R. App. P. 47.4.

[2]We use aliases for the children and their relatives throughout this memorandum opinion. *See* Tex. R. App. P. 9.8(b)(2). The names used bear no relation to their legal names.

# I. BACKGROUND

On October 7, 2004, Tamara gave birth to Tommy, whose father was Kyle Grant. Kyle had seven other children with other women and had prior assault convictions for physically abusing some of these women. Kyle admittedly dealt heroin. In December 2011, Kyle "spanked" Tommy with a belt to discipline him for "trouble at school." Tamara was in a different room at the time, but when Tommy's urine was dark the next day, Tamara's mother called for an ambulance to take him to the hospital. Tommy was in a lot of pain and had injuries to his arm, his thighs, and his buttocks. The Texas Department of Family and Protective Services (DFPS) received a referral to investigate whether Tommy had been physically abused or neglectfully supervised by Tamara or Kyle. The investigator, Ekaterina Gonzalez, determined that there was reason to believe Kyle had abused Tommy but was unable to determine if Tamara had neglectfully supervised him. As a result of this incident, Tommy walked with a limp. Tamara asserted that Tommy's limp was not caused by the spanking incident but agreed that Tommy was afraid of Kyle.

Tamara and Kyle's relationship apparently was sporadic because Tamara gave birth to Luke on March 15, 2012, but Luke's father was John Bates. Bates also had a criminal history with prior convictions for theft of property, burglary of a vehicle, possession of marijuana, criminal mischief, and assault. In any event, Kyle, who had remained a part of Tamara's and Tommy's lives, began physically abusing Tamara in 2012. In one instance, Kyle slapped Tamara while she was

pregnant with Luke. Tamara had another child with Kyle—Mary—on February 9, 2013.

On September 19, 2013, DFPS received another referral that Tamara was neglectfully supervising the children. It was reported to DFPS that Tommy and Luke were wandering the apartment complex where they lived and that their apartment emitted a strong marijuana odor. The DFPS investigator, Latrecia Woods, spoke to Tommy at school. He told her that he and Luke were allowed to play outside the apartment by themselves while Tamara stayed inside and that he was concerned for Mary because she had been "gone for a little while." Tommy told Woods that Tamara told him that Mary would return "when [Tamara] was able to buy Pampers." The manager of the apartment complex confirmed that Tamara's apartment smelled of marijuana, Tommy frequently was unsupervised, and Tommy was able to climb a fence to get to a vacant lot behind the complex. She also recounted that Tamara was not paying rent and that she would be evicted. Tamara admitted to Woods that she allowed Tommy and Luke to play alone outside and would supervise them from a couch inside the apartment. Tamara told Woods that Mary was living with her godmother, Susan Kramer, and had been with her for approximately three months. Kramer had an open DFPS case regarding her children at the time. Tamara admitted to Woods that she had been diagnosed with postpartum depression and had previously thought of committing suicide, but denied having any current suicidal thoughts.

3

Her gynecologist had referred her to a psychiatrist for the depression, but Tamara never followed up on this recommendation.

DFPS entered into a safety plan with Tamara, who agreed that she and her mother, who was living with Tamara and the children, would supervise the children better. As part of the plan, Tamara agreed to tell DFPS if she moved or was evicted. Tamara was evicted in October 2013, but she did not inform DFPS. Tamara and Tommy began living at the same apartment complex with Tamara's friend, Kim White, who had a DFPS case pending regarding her children.[3] Kyle also lived at the same apartment complex. When Woods located Tamara, she admitted that she had failed to inform DFPS about the eviction and that she had smoked marijuana during this time. Woods gave her a drug test, which showed that Tamara had been using amphetamines. Tamara explained that the marijuana must have been "laced" with amphetamines. Tamara never followed up on the referrals for drug treatment.

Because Woods was concerned about Tamara's drug use and lack of stability, she entered into a new safety plan with Tamara and placed Tommy with Kyle's mother and Mary and Luke with Adams and Lewis. A few days later on October 25, 2013, Woods met with Tamara, Kyle's mother, Adams, and Lewis. It was decided that Tamara and the children would live with Tamara's great-

---

[3]After the eviction, Luke began living with his godparents, Cindy Adams and Diane Lewis. DFPS later determined that Adams had a prior DFPS case "that involved a child death."

4

grandmother, Eunice Goode, who would "help [Tamara] out with parenting" in order for Tamara to show that she "could parent her kids." But when Woods visited the home about three weeks later, Goode said that the arrangement was not working and that Tamara and the kids had to move out of her home:

> [S]he was tired of [Tamara] . . . not watching the kids like she was supposed to. [Goode] said the time frame that the kids had been there, they had already broken off a knob that goes to a heater that was in the bathroom. They had tor[n] up a couple of mini blinds.
>
> She was concerned that [Tamara] stays up all night on the phone and then sleeps all day. [Goode] has to constantly, you know, yell at [Tamara] about changing the kids' diapers, changing their clothes. There was concerns with [Tamara] staying in the same clothes for, like, two days straight without bathing, sneaking out of the house.
>
> . . . .
>
> . . . There was concern with [Tamara] leaving the house at night when [Goode] was asleep with the kids, not watching them when they were outside. . . .
>
> . . . .
>
> Both kids were—had soaking wet diapers on. It was just—you could tell it was just a lot of hostility going in the house.

Tamara believed Goode was "being old, was being fussy and . . . didn't want anybody coming to her house." Tamara "stated she should be able to leave the home if she feels like she needs a break."

Based on this visit, Woods found reason to believe that Tamara had neglectfully supervised the children. Because no other relatives were willing to allow Tamara and the children to live with them, DFPS filed a suit affecting the

5

parent-child relationship on November 19, 2013, seeking the emergency removal of the children and termination of Tamara's, Kyle's, and Bates's parental rights if reunification could not be achieved. The same day, the trial court entered an emergency order naming DFPS as the children's temporary sole managing conservator.

DFPS entered into several service plans with Tamara during the case, requiring her to take or refrain from certain actions in order to be reunited with her children:

1. Be screened for mental illness and "maintain" any medication prescribed for any diagnosed condition;

2. Participate in family counseling with Tommy;

3. Participate and successfully complete individual counseling;

4. Attend parenting classes;

5. Attend all scheduled, weekly visitations with the children;

6. Obtain "safe, stable and appropriate housing";

7. Not be involved in or associate with those who are involved in criminal activity;

8. Submit to random drug testing; and

9. Provide DFPS with proof of employment "by offer letter or pay stubs on a biweekly basis."

Tamara complied with DFPS's drug-testing requests, obtained a mental-health screening, and completed individual counseling. However, Tamara never obtained appropriate housing, failed to consistently take the medication

6

prescribed for her bi-polar disorder, sporadically saw the children and stopped her visits altogether in December 2014, did not successfully complete counseling with Tommy, and never provided DFPS proof of her claimed employment.

DFPS proceeded to trial on its termination petition on April 14, 2015. The day before the trial, the children's attorney ad litem reported to the trial court that she was in favor of terminating the parental rights of Tamara, Bates, and Kyle. The court-appointed special advocate, Alicia Hooper, likewise filed a report with the trial court recommending that their parental rights be terminated. Bates filed an affidavit of relinquishment of his parental rights as to Luke.

At trial, Tamara testified that termination would "hurt" Tommy and that she loved her children. She stated that her problems with visiting the children were a result of her job with a commercial construction company because the company would not allow her to miss work to visit with her children during the day. She was, however, able to take a week off of work for a "family emergency" in Dallas when her uncle died. At trial, she did not know her uncle's last name, only that he had been married to her aunt. Tamara admitted that she never provided DFPS with proof of her employment and that she had not found appropriate housing. She explained that she could not obtain suitable housing because she was required to pay $700 before she would be allowed to rent a governmentally subsidized apartment. Tamara asserted that she worked at least forty hours a week at $8 to $10 per hour but that she had to buy food, gas, and "personal items every month." Tamara did not have a car and did not have a driver's

license. She admitted that she had been given eighteen months to comply with the service plans. Although Tommy had behavioral problems, Tamara had no plan for how to handle this. Although she was aware of Kyle's "lengthy criminal history," Tamara continued to desire Kyle's involvement in the children's lives.

Hooper testified that she supported termination, which comported with her pretrial recommendation. Hooper based her assessment on noted behavioral improvements in Mary, Luke, and Tommy since Tamara stopped visiting them. Hooper further noted that Tamara's nickname for Tommy was "Fat Boy" and that Luke's was "Retard." The children were happy in their foster home. A DFPS conservatorship worker, Dereka Davis, testified that she also believed termination would be in the children's best interests. Davis based her assessment on Tamara's failure to have any contact with her children for four months, refusal to take her medication for her bi-polar disorder, disinterest in parenting her children, lack of a plan to deal with Tommy's problems, continued desire for Kyle's involvement, and failure to secure stable housing for the children. The trial court found by clear and convincing evidence that termination of Tamara's parental rights was in the best interests of the children and that she had

> . . . knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children;

> . . . engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being [of] the children;

8

. . . failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the children who have been in the permanent or temporary managing conservatorship of [DFPS] for not less than nine months as a result of the children's removal from the parent . . . .

*See* Act of Mar. 30, 2015, 84th Leg., R.S., S.B. 219, ch. 1, § 1.078, sec. 161.001, 2015 Tex. Sess. Law Serv. 1, 18–20 (West) (to be codified as an amendment to Tex. Fam. Code Ann. § 161.001).[4] The trial court also terminated Kyle's and Bates's parental rights to the children. Only Tamara appeals from the termination order.

## II. LEGAL CONSIDERATIONS IN PARENTAL-TERMINATION CASES

We strictly scrutinize termination proceedings and construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Parental rights, although constitutional in dimension, are not absolute. *See In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001(b), 161.206(a) (West 2014). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2014). "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Therefore, to justify termination of a parent-child

---

[4]For the remainder of this memorandum opinion, we will cite to the new section number as it will appear in the Family Code.

9

relationship, DFPS must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803. Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

### III. DISCUSSION

#### A. STANDARD AND SCOPE OF REVIEW

We need not exhaustively detail the relevant evidence supporting the termination decision if we are affirming the fact-finder's decision. *A.B.*, 437 S.W.3d at 500. In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment and resolve any disputed facts in favor of the finding if a reasonable fact-finder could have done so. *Id.*

In reviewing the evidence for factual sufficiency, we give due deference to the fact-finder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the

10

entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated a subsection of section 161.001(b)(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

## B. SECTION 161.001(b)(1): PROHIBITED ACTIONS

In issue one, Tamara challenges the legal and factual sufficiency of the evidence to support each section-161.001(b)(1) ground alleged by DFPS and found by the trial court. Here, the trial court concluded that clear and convincing evidence supported three of section 161.001(b)(1)'s prohibited actions: (b)(1)(D), (b)(1)(E), and (b)(1)(O). We need only conclude that one of the prohibited actions listed in section 161.001(b)(1) was supported by sufficient evidence. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

Tamara asserts that the evidence was legally and factually insufficient to support the finding that she engaged in conduct or knowingly placed Tommy, Luke, and Mary with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Tamara focuses her argument on the fact that her only "pattern of conduct" was the failure to secure appropriate housing based on her financial situation: "Apart from the initial allegation of neglectful supervision, there isn't a single allegation of an act by [Tamara] that involves violence, mistreatment, failure to protect, or a conscious pattern of conduct that might have jeopardized her children."

11

To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). Under subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Termination must be based on more than a single act or omission, and there must be a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533. A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013) (en banc op. on reh'g), *aff'd*, 437 S.W.3d 498. "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child. *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). Finally, we may consider conduct that occurred outside the children's presence, including conduct before a child's birth. *Walker v. Tex. Dep't of Family*

12

*& Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

The evidence shows that Tamara consistently insisted that Kyle be involved in the children's lives. She held to this belief even after discovering that Kyle had assaulted several of his prior paramours, sold and used heroin, hit Tommy so hard with a belt that he had to be taken to the hospital, and completely failed to visit the children or comply with the required services after the children were removed. Tamara allowed Tommy and Luke to wander their apartment complex unsupervised, and Tommy was able to climb a fence to get into an adjacent vacant lot. Tamara's apartment smelled of marijuana smoke. Kyle physically abused Tamara while she was pregnant with Luke. After Tamara gave birth to Luke, she did not take him home with her from the hospital but sent him to live with Adams and Lewis, Luke's godparents whom Tamara had recently met, because she chose to continue to live with Kyle. Luke stayed with Adams and Lewis for the first six months of his life. Adams had been involved in a prior DFPS case "that involved a child death." Mary had spent a significant portion of her short life with her godmother, Kramer, who also had a pending DFPS case regarding her children. Tamara failed to supervise the children after the four of them moved in with Goode and was unable to protect them. Although Tamara testified that she was not involved in criminal activity, she admitted that she smoked marijuana and she tested positive for amphetamine use. Further, while the termination case was pending, Tamara began dating a man whom she knew

13

to have a criminal history, as did Kyle and Bates. Tamara's lifestyle subjected the children to instability, and Davis testified that Tamara was not raising the children but parceled them out to be raised by friends. Even after the children were in the possession of DFPS and Tamara had been ordered to attend weekly visitations with them, she continued to deprive her children of stability and consistency as a parent by failing to attend visitation for four months.

We conclude that this evidence was legally and factually sufficient to allow the trial court as fact-finder to determine that Tamara engaged in conduct or knowingly placed Tommy, Luke, and Mary with persons who engaged in conduct that endangered their physical or emotional well-being. *See In re A.A.M.*, Nos. 01-14-00798-CV & 01-14-00801-CV, 2015 WL 1247268, at *3–4 (Tex. App.—Houston [1st Dist.] Mar. 17, 2015, no pet.) (recognizing parental drug use and abusive conduct by a family member may endanger a child's well-being under subsection (b)(1)(E)); *In re E.R.*, No. 12-14-00171-CV, 2014 WL 6977810, at *7 (Tex. App.—Tyler Dec. 10, 2014, no pet.) (mem. op.) (holding evidence sufficient to support termination under subsection (b)(1)(E) because mother continued to have relationships with known criminals during pendency of termination case); *In re C.J.S.*, 383 S.W.3d 682, 689–90 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (finding sufficient evidence of endangerment under subsection (b)(1)(E) based on parent's positive drug tests, poor judgment, and lack of impulse control); *In re J.T.G.*, 121 S.W.3d at 131 (holding evidence legally sufficient to support endangerment findings because parent had history of

14

domestic violence, drug abuse, and criminal conduct). We need not address the sufficiency of the evidence to support termination under subsections (b)(1)(D) or (b)(1)(O), and we overrule issue one. *See* Tex. R. App. P. 47.1; *A.V.,* 113 S.W.3d at 362.

### C. SECTION 161.001(b)(2): BEST INTEREST

In her second issue, Tamara argues that the evidence was factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of the children. There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006). But prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014).

We review the entire record to determine the child's best interest. *In re E.C.R.,* 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection-(1) ground and the best-interest determination. *C.H.,* 89 S.W.3d at 28; *see E.C.R.,* 402 S.W.3d at 249. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

15

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*E.N.C.*, 384 S.W.3d at 807 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"). These factors are not exhaustive, and strong or undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *C.H.*, 89 S.W.3d at 27.

The evidence at trial showed that Tommy, Luke, and Mary had behavioral and developmental issues when DFPS removed them from Tamara's supervision. All three improved after the removal and made significant improvements after Tamara stopped visiting them in December 2014. At the time of trial, Tamara had not secured an appropriate living situation for her three children, was not taking her medications, and did not know how to deal with Tommy's behavioral issues. Tommy was far behind in school and needed a "very strong parental environment." Hooper testified that Tamara gave Tommy too much responsibility in caring for Luke and Mary and did not provide the

16

structured environment Tommy needed. Tommy, Luke, and Mary were happy in their foster home. Although Tamara testified that termination of her parental rights was not in the children's best interest because it would "hurt" Tommy, the children's attorney ad litem, Hooper, and Davis believed termination of Tamara's parental rights was in their best interest. Davis stated that the children should not be returned to Tamara "due to the lack of stability in either parents' lives and just their unwillingness to do whatever is necessary to get their children back." And as we recounted previously, the clear and convincing evidence showed that Tamara engaged in conduct or knowingly placed Tommy, Luke, and Mary with persons who engaged in conduct that endangered their physical or emotional well-being. *See E.C.R.*, 402 S.W.3d at 249 ("Many of the reasons supporting termination under [section 161.001(b)(1)] also support the trial court's best-interest finding.").

Considering the relevant factors, we hold that in light of the entire record and giving due consideration to evidence that the trial court reasonably could have found to be clear and convincing, the trial court reasonably could have formed a firm belief or conviction that termination of Tamara's parental rights was in the children's best interest. *See In re T.G.R.-M.*, 404 S.W.3d 7, 16–17 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (holding evidence sufficient to support best-interest finding, even though mother received some support services, where child was thriving in foster care and mother had not demonstrated ability to provide stable environment or emotional support); *In re Z.C.*, 280 S.W.3d 470,

17

476 (Tex. App.—Fort Worth 2009, pet. denied) (holding "stability and permanence" found in foster care and children's improving condition sufficient to support best-interest finding); *Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.) ("[I]n considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past."). We overrule issue two.

## IV. CONCLUSION

Because legally and factually sufficient evidence supported the trial court's finding that Tamara violated section 161.001(b)(1)(E) and factually sufficient evidence supported the trial court's finding that termination of Tamara's parental rights was in the children's best interest under section 161.001(b)(2), we overrule Tamara's issues. We therefore affirm the trial court's judgment.

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL: LIVINGSTON, C.J.; GABRIEL and SUDDERTH, JJ.

DELIVERED: July 16, 2015

18