Opinion issued March 28, 2019



In The

# Court of Appeals

### For The

# First District of Texas

————————————

## NO. 01-18-00888-CV

————————————

## IN THE INTEREST OF E.V.V.M.-H., JR., A CHILD

---

### On Appeal from the 315th District Court
### Harris County, Texas
### Trial Court Case No. 2017-03568J

---

### MEMORANDUM OPINION

This is an appeal from the trial court's decree terminating the parents' parental rights to their child. As to the mother, the trial court found that termination was warranted under Texas Family Code subsections 161.001(b)(1)(D) and (E), and that termination was in the best interest of the child under subsection 161.001(b)(2). As to the father, the trial court found that termination was warranted under Texas Family

Code subsections 161.001(b)(1)(D), (E), and (O), and that termination was in the best interest of the child under subsection 161.001(b)(2).

In her appeal, the mother challenges the legal and factual sufficiency of the evidence supporting each of the trial court's findings. The father's appointed appellate counsel has moved to withdraw and filed an *Anders* brief, stating that, in his professional opinion, the appeal is without merit and that there are no arguable grounds for reversal. *See Anders v. California*, 386 U.S. 738, 744 (1967). We affirm.

## BACKGROUND

Since 2014, the mother has made her living as an unlicensed masseuse, offering massages while dressed in lingerie. She uses online advertising to promote these services. The advertisements feature provocative pictures and provides links to lingerie that customers may buy for her to wear during their massage. The mother's online presence also contains sexually explicit photos. The mother admitted that some of the terms and photos used in her online postings could lead someone to believe that she was available for "full sessions," but she denied having sex with customers.

At times, the mother has worked out of an office, but at trial, she testified that she has been working out of the second bedroom in her apartment for about 10 months. When the mother schedules an appointment with customers, she does not ask for their names or any form of identification. She provides them with directions

2

to her apartment complex and the access number for the complex's driveway gate. The mother agreed that what she does for a living is dangerous and that some of the men visiting the site where she advertised were predators looking for escorts, but she denied ever having a problem with a customer.

The father testified that he began smoking marijuana when he was 16 years old. He quit when he joined the Navy at age 20, but eventually began abusing drugs again. The Navy discharged him for using synthetic marijuana.

The father and mother met through a dating website and moved in together several months later. They would smoke marijuana together almost daily. They also used methamphetamine and cocaine. The father would use cocaine most weekends and the mother would join him once in a while. When they were not using drugs, they had very little to do with each other. The mother described their relationship as unhealthy, with verbal abuse that sometimes escalated to physical abuse.

The mother discovered she was pregnant with Eddie in the fall of 2015, near the end of the first trimester. She testified that she stopped using drugs at that time. The father, however, testified that the mother stopped using methamphetamine, but continued to use marijuana for a short time after learning she was pregnant. The Department became involved in June 2016, when the mother tested positive for

marijuana at Eddie's birth.[1] Eddie did not test positive; the mother explained that she used the marijuana that day to alleviate her labor pains because the hospital would not admit her. In August 2016, the father tested positive for both marijuana and cocaine. Child Protective Services (CPS) referred the parents to Family-Based Safety Services (FBSS), and the parents voluntarily placed the child with a caregiver.

As part of her services, he mother underwent a psychiatric evaluation in late 2016. She was diagnosed with an anxiety disorder and received prescription medication. The mother also successfully completed substance-abuse treatment. At discharge, the treatment provider recommended that she continue to take the prescribed medication to maintain her mental health. The mother nevertheless did not return to the psychiatric clinic and stopped taking the medication.

The father completed a drug assessment and was referred to substance-abuse treatment. He submitted to random drug testing and successfully completed the outpatient treatment program.

In early 2017, CPS transitioned Eddie to his parents' care. One evening shortly thereafter, the parents had an altercation. The father went drinking with a friend one night and left the mother alone to care for Eddie, who was ill. The mother asked the father to return so they could take Eddie to the emergency room. The father arrived

---

[1] "Eddie" is a pseudonym. *See* TEX. R. APP. P. 9.8.

4

home drunk and incoherent, which angered the mother, and they began fighting. The father cornered the mother, who was holding Eddie, near the front door of the apartment. A neighbor heard them fighting and called the police to intervene. The father was charged with class A misdemeanor assault; he pleaded guilty to the charge and served 30 days in county jail.

After this incident, the parents stopped living together. The mother testified that her relationship with the father ended, although other evidence at trial showed that they still spent time together, even when a protective order was in place to prevent the father from visiting the mother's apartment.

The mother admitted to the caseworker that domestic violence had been ongoing in the parents' relationship. She said that she had not disclosed the domestic violence in the past because she wanted to move forward and have CPS's involvement end.

The father told the caseworker a different story. He conceded that he had pleaded guilty to the assault charge but denied hitting the mother. He accused the mother of hitting him and frequently being the instigator of their fights. Evidence shows that each was involved in incidents involving broken windows and other property damage to the other's home.

The Department re-opened the FBSS case due to the domestic violence allegations and additional substance-abuse concerns. Both parents agreed to participate in anger management, domestic violence, and individual counseling.

By April 2017, neither parent had completed these services, and both had relapsed into substance abuse. The father tested positive for marijuana and cocaine. The mother, who was pregnant with her second child, was using alprazolam without a prescription.

In May, the mother did not appear for scheduled psychiatric and counseling appointments or for drug testing. The father again tested positive for marijuana. In June, the mother admitted to using alprazolam and marijuana, and the father admitted to using marijuana and cocaine. The parents agreed to place the child with a family friend. In late June, the Department filed the underlying petition, and the trial court appointed the Department as Eddie's temporary managing conservator.

The father and mother continued to meet occasionally to use drugs and have sex. When the mother was about 20 weeks' pregnant, she went on a two-day cocaine binge with the father, then tried to commit suicide by overdosing on alprazolam and alcohol and cutting her wrists. A male companion took her to the emergency room for treatment.

At a psychological assessment in the fall of 2017, the mother admitted that she had recently used marijuana. The written report from the assessment states that

6

the mother did not appear to understand the effect that her drug use was having on the unborn child. The mother continued to perform lingerie massages while pregnant. Her online advertising at that time featured her pregnancy, and she testified that she had consistent work during that time.

Before giving birth to her second child, the mother arranged a private adoption by a family in another state. After giving birth in November 2017, the mother signed an affidavit relinquishing the baby to the adoptive parents.

Around the same time, the father contacted the caseworker and informed her that he intended to move to Alaska and wanted to relinquish his parental rights to Eddie. In a Facebook posting a few months later, the father wrote that he was thinking about moving to Colorado or Alaska to begin a marijuana growing business. The father testified that he "gave up" on working towards Eddie's return at that time. He did not complete any of the services required under his family service plan and did not see Eddie again until shortly before trial, when he attended two supervised visits with the mother. The father testified that he continued to use marijuana and would test positive for it.

Several months before trial, the mother had another dating relationship that also involved domestic violence, even while she was participating in the domestic-violence program required by her service plan. Following one incident with this man, she told the police that he had held a pillow over her head and placed his hands

around her neck but didn't choke her, and that she did not want to press charges. At trial, the mother admitted that she had called the police, but denied that the man had grabbed her neck; she claimed that they simply had a misunderstanding. The caseworker testified to her concern that the mother lacked the judgment to avoid violent men and would put Eddie at risk by continuing to become involved in abusive relationships and to invite strange men into her home to earn money.

When Eddie came into the Department's custody in June 2017, he was placed with foster parents and was in the same placement at time of trial. The foster mother appeared at trial and expressed the family's desire to adopt Eddie, telling the trial court that the family loves Eddie and wants him to be part of their family. Eddie's guardian ad litem observed that Eddie is very loved and well cared for by the foster family. Eddie has developed a strong bond with the family, and the family provides him with a safe and nurturing home. Then two years old, Eddie was healthy, growing, and thriving. He was developmentally on target, verbal, and able to recite the alphabet.

## MOTHER'S APPEAL

The mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings that she knowingly placed or knowingly allowed Eddie to remain in conditions or surroundings that endangered his physical or emotional well-being; that she engaged in conduct or knowingly placed Eddie with

persons who engaged in conduct that endangered his physical or emotional well-being; and that termination of her parental rights is in Eddie's best interest.

## A. Applicable Law and Standard of Review

Parents' rights to the "companionship, care, custody, and management" of their child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *accord In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). We therefore strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Parental rights, however, are not absolute and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that parents may forfeit their parental rights by their acts or omissions, the primary focus of a termination suit is protection of the child's best interest. *Id.*

In a case to terminate parental rights by the Department under section 161.001 of the Family Code, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and, (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007;

*see In re J.F.C.,* 96 S.W.3d 256, 264 (Tex. 2002). "'Only one predicate finding' under section 161.001(b)(1) 'is necessary to support a termination decree when there is also a finding that termination is in the child's best interest.'" *In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (quoting *A.V.*, 113 S.W.3d at 362).

In a legal-sufficiency review in a parental-rights termination case, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.*

In a factual-sufficiency review in a parental-rights termination case, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). By focusing on whether a reasonable factfinder could form a firm conviction or belief, the appellate court maintains the required deference for the factfinder's role. *Id.* at 26. "An appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *Id.* We should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in

favor of its finding. *J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

## B. Endangerment Finding

The mother contends that the evidence is legally and factually insufficient to support the trial court's predicate findings for termination under subsection 161.001(b)(1). Because only one predicate finding is necessary to support termination if the evidence supports the trial court's best-interest finding, we address the mother's challenge to the finding under subsection (E), which is dispositive of this issue.

Subsection (E) permits termination when a parent has endangered the child. Specifically, it provides that a trial court may order termination upon a finding, by clear and convincing evidence, that a parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). "Endangerment means to expose to loss or injury, to jeopardize." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam).

Termination under subsection (E) must be based on more than a single act or omission; rather, the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* TEX. FAM. CODE § 161.001(b)(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's physical or emotional well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). Further, relevant conduct may occur before or after a child's birth. *In re J.H.G.*, No. 01-16-01006-CV, 2017 WL 2378141, at *6 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.); *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

"As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *N.A.B. v. Tex. Dep't of Family & Protective Servs.*, No. 03-14-00377-CV, 2014 WL 6845179, at *2 (Tex. App.—Austin Nov. 26, 2014, no pet.) (mem. op.). Illegal drug use may support termination under section 161.001(b)(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App—Houston [1st Dist.]

2009, pet. denied). And, because substance abuse harms the parenting relationship, it can constitute endangerment even if it occurs outside the child's presence. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *Walker*, 312 S.W.3d at 617; *see also In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *10 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.) ("[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being.").

Although the mother testified that she stopped using drugs after discovering she was pregnant with Eddie, some evidence indicates that she did not, and she tested positive for marijuana the day Eddie was born. While this termination case was pending, and she was pregnant with her second child, the mother went on a two-day cocaine binge that ended in a suicide attempt. The mother also admitted to using marijuana "pretty recently" before the psychological assessment conducted when she was about seven or eight months' pregnant with the second child. A mother's knowing use of drugs during pregnancy constitutes a conscious course of conduct that endangers a child's physical and emotional well-being. *See J.O.A.*, 283 S.W.3d at 345; *In re C.J.S.*, 383 S.W.3d 682, 690 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *In re A.S.*, 261 S.W.3d 76, 86 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *J.T.G.*, 121 S.W.3d at 125; *see also In re E.A.W.S.*, No. 02-06-00031-CV,

2006 WL 3525367, at *11 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.) (mother endangered her unborn child's physical well-being by overdosing on sleeping pills while 39 weeks' pregnant). A parent's suicide attempt also may contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being. *See In re A.M.C.*, 2 S.W.3d 707, 716 (Tex. App.—Waco 1999, no pet.).

The mother admitted that the violence during her relationship with the father was "ongoing." This admission supports a reasonable inference that domestic violence occurred during her pregnancy with Eddie, and, shortly after CPS returned Eddie to the mother in early 2017, the father and mother had an altercation while the mother was holding Eddie. Domestic violence, lack of self-control, and a propensity for violence is evidence of endangerment. *See L.B. v. Tex. Dep't of Family & Protective Servs.*, No. 03-09–00429-CV, 2010 WL 1404608, at *5 (Tex. App.—Austin Apr. 9, 2010, no pet.) (mem. op.) (holding that evidence of exposure to domestic violence and drug abuse allowed rational factfinder to form firm belief or conviction that mother engaged in course of conduct that endangered her children).

The mother's method of selecting customers to earn income also poses a threat to Eddie's well-being. The mother testified that she regularly provides the men with her address and access gate code and allows them into her apartment without asking for any identifying information.

The mother acknowledged that sexual predators visit the website where she advertises but dismissed the notion that her means of obtaining income presented a greater risk to her safety and well-being than other jobs. During this case, she had two intimate relationships, both of which involved domestic violence and included criminal charges against each man. Despite this history, the mother believed that she could evaluate whether a potential customer might be problematic from a single telephone call. The mother assured the trial court that she would rent office space and that Eddie would not be present while she was working but admitted that she continued to work out of her apartment while visibly pregnant with her second child.

As a result of the mother's activities, numerous unknown men, including possible sexual predators, have easy access to her home. This home environment endangers a child's physical and emotional well-being because she has created a potential for danger that she disregards. *See J.H.G.*, 2017 WL 2378141, at \*6.

Considering all the evidence in the light most favorable to the endangerment finding, we conclude the trial court reasonably could have formed a firm belief or conviction that the mother engaged in conduct described in subsection 161.001(b)(1)(E). Further, in light of the entire record, the disputed evidence the trial court could not reasonably have credited in favor of its endangerment finding is not so significant that the court could not reasonably have formed a firm belief or conviction that the mother endangered Eddie. Accordingly, the evidence is legally

and factually sufficient to support the trial court's finding of endangerment under subsection E. Because the evidence is sufficient to support the trial court's finding under subsection E, we do not consider the trial court's finding under subsection (D). *See A.V.*, 113 S.W.3d at 362.

## C.    Best-Interest Finding

The mother contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in Eddie's best interest. Appellate courts examine the entire record to decide what is in the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). A strong presumption exists that a child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). In considering whether termination is in a child's best interest, courts consider the following nonexclusive factors identified by the Texas Supreme Court in *Holley v. Adams*:

> (a) the desires of the child,
> (b) the emotional and physical needs of the child now and in the future,
> (c) the emotional and physical danger to the child now and in the future,
> (d) the parental abilities of the individuals seeking custody,
> (e) the programs available to assist these individuals to promote the best interest of the child,
> (f) the plans for the child by these individuals or by the agency seeking custody,
> (g) the stability of the home or proposed placement,

16

(h) the parent's acts or omissions that may indicate the existing parent-child relationship is not a proper one, and

(i) any excuse for the parent's acts or omissions.

544 S.W.2d 367, 372 (Tex. 1976). Evidence establishing one of the predicate acts under section 161.001(b)(1) may be relevant to determining the child's best interest, including endangerment of the child. *In re A.M.*, 495 S.W.3d 573, 581 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). The Department need not prove all of the best-interest factors as a condition precedent to parental termination, "particularly if the evidence was undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

The mother's endangering behavior while pregnant with the second child supports the trial court's finding that termination is in Eddie's best interest. Despite having participated in family services before becoming pregnant again, she engaged in behaviors that posed an extreme risk to the life of her unborn child.

The mother acknowledges that when the Department instituted these proceedings when, after her relapse into substance abuse, she struggled for a time, binging on cocaine and attempting suicide, but she points out that she regained her sobriety and completed all services required by the family service plan. The mother's relapse, however, occurred while her parental rights were in jeopardy and when she had been sober for less than a year. The caseworker testified to the Department's concern that the mother would resume substance abuse once the Department was no

longer monitoring her behavior. Based on this past behavior, the trial court could reasonably infer that the mother was likely to relapse again in the future. *See In re J.S.-A*, 2017 WL 891236, at *8 (Tex. App—Houston [1st Dist.] Feb. 15, 2018, pet. denied) ("Although evidence of past misconduct or neglect, standing alone, may not be sufficient to show present unfitness, a factfinder may measure a parent's future conduct by his past conduct indicating that it is in a child's best interest to terminate his parental rights.").

Further, despite the availability of programs to assist the mother in improving her parental abilities—specifically, in addressing domestic violence—she has not shown the kind of meaningful change that would prevent a reasonable factfinder from forming a firm belief or conviction that termination of her parental rights was in Eddie's best interest. The incident of assault that led to the father's criminal conviction occurred after the parents had successfully completed substance-abuse rehabilitation programs and other services during the FBSS phase, and shortly after CPS had returned Eddie to his parents. Although the parents could have attended domestic-violence classes before Eddie's return had CPS known domestic violence was a problem, the mother admitted that she did not tell CPS about the ongoing violence in her relationship with the father because doing so might have prolonged the agency's involvement. The incident of assault during the mother's second relationship occurred while she was attending domestic-violence classes. She asked

police to drop charges against her partner, and her testimony at trial minimized the incident. These responses suggest that the mother did not learn or choose to implement the lessons from the domestic-violence classes. The mother notes her testimony that she is abstaining from intimate relationships, but neither her experience in past relationships nor her current relationship status demonstrates an ability to avoid future violent partners or the circumstances that lead to domestic violence.

Eddie is too young to express his desires and also too young to protect himself from danger. He is a happy child and enjoyed visits with the mother. Some evidence indicates that he is bonded with the mother; other evidence, however, suggests that that bond has weakened with the passage of time. He has lived with the foster parents most of his young life; they provide a safe, loving, and nurturing home. The foster mother expressed the family's love of Eddie and desire to have him become a part of their family. The record also shows that the Department recently became aware of a possible kinship placement, which it intended to explore further before deciding Eddie's permanent placement.

Considering the *Holley* factors and reviewing all of the evidence in the light most favorable to the trial court's finding, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of the mother's parental rights was in Eddie's best interest. Moreover, none of the disputed evidence

19

was so significant that the factfinder could not have formed such a firm belief or conviction. We therefore conclude that the evidence was both legally and factually sufficient to support termination of the mother's parental rights to Eddie.

**FATHER'S APPEAL**

The father's court-appointed appellate counsel has moved to withdraw and filed an *Anders* brief, stating that, in his professional opinion, the appeal is without merit and that there are no arguable grounds for reversal. *See Anders*, 386 U.S. at 744.

*Anders* procedures are appropriate in an appeal from a trial court's final order in a parental-rights termination suit. *In re K.D., et al.*, 127 S.W.3d 66, 67 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Counsel has certified that he delivered a copy of the brief to the father and informed him of his right to examine the appellate record and to file a response. *See In re Schulman*, 252 S.W.3d 403, 408 (Tex. Crim. App. 2008). The father did not timely file a response and DFPS waived its right to respond.

The brief submitted by the father's appointed appellate counsel states his professional opinion that no arguable grounds for reversal exist and that any appeal would therefore lack merit. *See Anders*, 386 U.S. at 744. Counsel's brief meets the minimum *Anders* requirements by presenting a professional evaluation of the record

20

and stating why there are no arguable grounds for reversal on appeal. *See id.* at 744; *Schulman*, 252 S.W.3d at 406–07.

When we receive an *Anders* brief from an appointed attorney who asserts that no arguable grounds for appeal exist, we determine independently whether arguable grounds exist by conducting our own review of the entire record. *Johnson v. Dep't of Family & Protective Servs.*, Nos. 01-08-00749-CV & 01-08-00750-CV, 2010 WL 5186806, at *1 (Tex. App.—Houston [1st Dist.] Dec. 23, 2010, no pet.) (mem. op.); *see K.D.*, 127 S.W.3d at 67; *In re D.E.S.*, 135 S.W.3d 326, 330 (Tex. App.—Houston [14th Dist.] 2004, no pet.). If we determine that arguable grounds for appeal exist, we abate the appeal and remand the case to the trial court to allow the appointed attorney to withdraw. *See Johnson*, 2010 WL 5186806, at *2. Then, the trial court appoints another attorney to present all arguable grounds for appeal. *See id.*

On the other hand, if our independent review of the record leads us to conclude that the appeal is frivolous, we may affirm the trial court's judgment by issuing an opinion in which we explain that we have reviewed the record and find no reversible error. *See id.*

Accordingly, we have reviewed the record and, having found no reversible error, we affirm the trial court's judgment and grant counsel's motion to withdraw. *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam); *A.M.*, 495 S.W.3d at 581. Counsel's duty to his client extends through the exhaustion or waiver of "all

appeals." TEX. FAM. CODE § 107.016(2)(B). If the father chooses to pursue a petition for review to the Supreme Court of Texas, "appointed counsel's obligations can be satisfied by filing a petition for review that satisfies the standards for an *Anders* brief." *P.M.*, 520 S.W.3d at 27–28.

## CONCLUSION

We affirm the judgment of the trial court.


Gordon Goodman
Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.