**Affirmed and Opinion filed September 20, 2012.**



In The

# Fourteenth Court of Appeals

### NO. 14-12-00330-CV

## IN THE INTEREST OF C.J.S AND S.G.B., JR., CHILDREN

**On Appeal from the 315th District Court
Harris County, Texas
Trial Court Cause No. 2009-09041J**

## O P I N I O N

This case presents the difficult question that Department[1] workers and trial judges face on a daily basis: When children have been successfully placed with a foster family that might adopt, should the State take a chance on a parent who might never be successful? Appellant Latasha J. appeals from the trial court's order terminating her parental rights to her sons, C.J.S. and S.G.B. In five issues, she challenges the legal and factual sufficiency of the evidence to support the trial court's termination findings. We affirm.

---

[1] "Department" refers to the Texas Department of Family and Protective Services.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 17, 2009, Latasha's child S.G.B. was admitted into Children's Memorial Hermann Hospital with bronchitis. On December 22, the Department received a referral from a social worker at the hospital alleging that S.G.B. was ready to be discharged on December 20 but Latasha had not picked him up and the hospital did not know where she was.

The Department had received an earlier referral on September 20, 2009, from Latasha, alleging neglectful supervision of two-year-old C.J.S. by his father, Cory.[2] Cory reportedly took C.J.S. away from Latasha and kept C.J.S. at the residence that Cory shared with his sister Brittany. Cory and Brittany purportedly used marijuana and cocaine, and Cory allegedly sold marijuana. When a Department investigator visited the residence on September 30, Brittany informed the investigator that Cory had returned C.J.S. to Latasha. The investigator attempted to contact Latasha numerous times between September 30 and December 14. On December 15, the investigator finally reached Latasha, who said she thought the case had been closed once Cory returned C.J.S. to her. She stated she had no contact with Cory after he returned C.J.S.

The Department took C.J.S. and S.G.B. into custody on December 23. The same day, the Department filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination of the Parent-Child Relationship and Application for Writ of Attachment as to C.J.S. and S.G.B. and Request for Temporary Orders. After an ex parte hearing, the trial court entered an emergency protective order making the Department temporary sole managing conservator of the children. The children were placed into a foster home with non-relatives.

---

[2] Latasha testified that "I fought [(blamed)] myself also because I also called CPS on myself." Apparently, Cory had failed to return C.J.S. after a visit some four months before. Latasha had been unable to contact Cory, so she tried to fill out a missing person report with the police. The police couldn't help Latasha because C.J.S. was purportedly with his father. Latasha then "tried to do child support." Agency personnel could not help Latasha because she did not have custody of C.J.S. and, therefore, would not be entitled to child support. Latasha then distributed flyers for a missing child, with a $500 reward, and then contacted the Department. The reason for the initial Department visit to Latasha's house, according to Latasha, was in response to her report of a missing child.

On January 4, 2010, the trial court ordered Latasha to comply with the terms of the Departments's family service plan. On February 5, Latasha signed the plan, which required, among other things, that she complete domestic violence, anger management, and parenting classes; maintain appropriate housing for the children; undergo psychological and psychiatric evaluations; attend therapy; and submit to random drug testing "with an understanding that every missed test will be considered positive."[3] The parent's acknowledgement stated:

> I understand the [plan] is a very important document. I understand its purpose is to help me provide my child(ren) with a safe environment within a reasonable time [December 23, 2010]. I understand if I am unwilling/unable to provide my child(ren) with a safe environment, my parental and custodial rights may be restricted or terminated or my child(ren) may not be returned to me.

Latasha gave birth to a third child on May 2, 2011. On May 25, she tested positive for cocaine on a hair follicle drug test. The test results showed she had ingested cocaine "on more than one occasion" in the 90 days before being tested.[4] She denied having taken cocaine, but admitted that she missed four or five scheduled drug tests required by the family plan.

At the bench trial on termination of parental rights, Latasha did not seek to be the sole managing conservator of the children, which was consistent with her psychologist's recommendation:[5] she sought to keep the children in Department custody and to continue

---

[3] Latasha completed or attended domestic violence classes, parenting classes, anger management classes, a psychological evaluation, therapy, random drug testing and a substance abuse assessment.

[4] The person who administered Latasha's drug tests testified that the cutoff level for one use of cocaine is 300 picograms. Latasha tested positive for cocaine at a level of 514 picograms, which shows that she used cocaine more than once within 90 days before being tested.

[5] Latasha presented testimony from her psychologist:

> I want to make this very clear. I was not making recommendation that the children go home at this time, but I do think that this family needed to have more support to allow the children and the mother to develop community support and to be able to reunite this family. I do think that there was a premature decision to have this case go to another placement.

3

attending parenting classes. After trial, in a final termination order signed on March 28, 2012, the trial court terminated Latasha's parental rights based on Family Code section 161.001(1), subsections (D), (E), (F), and (O), finding Latasha (1) knowingly placed or allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children: (3) failed to support the children; and (4) failed to comply with the court-ordered family service plan. The trial court also found that termination was in the children's best interest under Family Code section 161.001(2).[6]

## LEGAL AND FACTUAL SUFFICIENCY CHALLENGE

In five issues, Latasha challenges the legal and factual sufficiency of the evidence supporting the trial court's termination findings.

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Due to the severity and permanency of the termination of parental rights, the burden of proof at trial is heightened to the clear and convincing standard. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re S.N.*, 287 S.W.3d 183, 187 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

When determining legal sufficiency, we review "all the evidence in the light most favorable to the [court's] finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the factfinder's conclusions, we must

---

[6] The trial court also terminated the parental rights of Cory, C.J.S.'s father, and Sherman, S.G.B.'s father. The termination of the two fathers' parental rights is not challenged in this appeal.

assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* However, this does not mean that we must disregard all evidence that does not support the finding. *Id.* Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

When reviewing a factual sufficiency challenge under the clear and convincing burden, the analysis is somewhat different in that we must consider all of the evidence equally, both disputed and undisputed. *See id.* We must consider whether the evidence is sufficient to produce in the mind of the factfinder a firm belief or conviction as to the truth of the allegation sought to be established. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under subsection (1) of 161.001 and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re S.N.*, 287 S.W.3d at 187.

On appeal, the Department contends that the grounds for termination are legally and factually sufficient under sections 161.001(1)(D), (E), and (O). We need only determine if the evidence is legally and factually sufficient to support a single basis for termination.[7] *See* Tex. Fam. Code § 161.001.

---

[7] The Department concedes the insufficiency of the evidence to support the trial court's finding under subsection (F).

## I. Endangering Conduct

Subsection (E) permits termination of parental rights when the parent has either personally engaged in conduct that endangers the child or knowingly placed the child with another person who engaged in dangerous conduct. *Id.* § 161.001(1)(E). As used in this statute, "endanger" means to "expose to loss or injury; to jeopardize." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* (quoting *Boyd*, 727 S.W.2d at 533). Rather, it is sufficient if the parent's conduct endangers the emotional well-being of the child. *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

Termination must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.* The requisite endangerment may be found if the evidence shows a parent's course of conduct that has the effect of endangering the child's physical or emotional well-being. *Id.* (citing *Boyd*, 727 S.W.2d at 534). In considering whether a relevant course of conduct has been established, a court properly may consider evidence establishing that a parent continued to engage in endangering conduct after the child's removal by the Department or after the child no longer was in the parent's care, thus showing the parent continued to engage in the course of conduct in question. *Id.* Endangerment under subsection (E) may include evidence of drug use and its effect on a parent's life and ability to perform the duties of a parent. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("It necessarily follows that the endangering conduct may include . . . evidence of drug usage."); *see also In re U.P.*, 105 S.W.3d 222, 234 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Conduct that subjects a child to a life of uncertainty and instability also endangers the physical and emotional well-being of a child. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

After the Department removed her two eldest children and three weeks after giving birth to her third child, Latasha tested positive for cocaine usage on a hair follicle test. The test results indicated Latasha used cocaine more than once in the 90 day period before she took the test.[8] *See In re C.A.B.*, 289 S.W.3d at 883 ("Termination under subsection 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required."). The test results did not show whether Latasha actually used cocaine while she was pregnant, but, if not, they indicate she used cocaine while she was taking care of her newborn infant. However, Latasha denied using cocaine, and Cory told a Department investigator that Latasha did not use drugs. C.J.S. and S.G.B. had been removed from Latasha's home by this point, but whether they were present at the time of the misconduct is not germane to our analysis. *See id.* Latasha also signed the family plan, which required her to submit to random drug testing "with an understanding [of the Department's policy] that every missed test [would] be considered positive." The Department also explained that policy to her, and she admitted that she understood the policy. Although Latasha completed several negative drug tests, she also missed four or five drug tests, citing scheduling and transportation issues. We have previously held, under similar circumstances, that "[a] factfinder reasonably could infer that [a parent's] failure to submit to the court-ordered drug screening indicated she was avoiding testing because she was using drugs." *Id.* at 885 (finding evidence of endangerment sufficient when mother had one prior conviction for possession of marijuana, one prior conviction for possession of methamphetamines, failed one drug test, and failed to submit to random drug tests).

Latasha also was evaluated by a Department social worker who reported, "There is concern that [Latasha] has some impairment to her judgment and ability to care for two

---

[8] Latasha's Family Service Plan states the Department intervened, among other things, "[d]ue to possible drug use as is indicated by reports that Ms. James had difficulty waking up while at the hospital." However, we find this statement to be conclusory. *See Hamrick v. Ward*, 359 S.W.3d 770, 785 (Tex. App.—Houston [14th Dist.] 2011, pet. filed) ("[C]onclusory statements are no evidence of the matter they seek to prove.").

young and vulnerable children." Her psychologist reported she had "impulsive tendencies, . . . limited comprehension of problem situations" and would "need the assistance and monitoring of another responsible adult to assist with childcare decisions, assuring appropriate and effective child care, and assisting with daily decisions regarding homemaking." He also testified Latasha "might have some difficulty assessing problem situations accurately and determining some effective solutions" and recommended that "her parenting would best be suited to being supportive [sic] by another responsible, reliable adult . . . who can assist with monitoring and making child care decisions." She did not have anyone to assume such a role. Latasha's therapist testified that she had "poor judgment and impulse control."

Several incidents that occurred after the children were taken into Department custody reflect Latasha's poor judgment and lack of impulse control. Latasha completed anger management classes in September 2010. Around that time, she "was involved in an altercation with another female" over a male.[9] In June 2011, Latasha told a therapist that she "did not know what she would do if she [lost] custody of her children," but she might "end up doing something . . . that would result in her being in jail." The therapist was concerned Latasha might hurt herself or others. On a later occasion, Latasha expressed anger towards her caseworker. When the therapist asked if she would hurt herself or others, Latasha responded, "I don't know." By way of excuse, Latasha testified that she was expressing anger toward the Department because "they wanted to terminate [her] rights to [the children]." Based on her concerns that Latasha might hurt herself or others, the therapist recommended that Latasha not be reunited with her children. In August 2011, Latasha's psychiatrist reported that Latasha "became very defensive" when confronted with missed appointments and "became angry" when she was confronted with a Department caseworker's "email about her homicidal ideations." She was also "very

---

[9] Latasha received a certificate of completion for anger management classes in September 2010. The record contains a substance abuse assessment report of an evaluation of Latasha in November 2010 indicating the altercation between the two women was "recent[]" and "resulted in *her* being hospitalized." (Emphasis added.) It is not clear whether Latasha or the other woman was hospitalized.

argumentative." In December 2011, during a visit to her therapist's office, Latasha "became very excitable" when she checked in. The front desk clerk asked Latasha for her Texas driver's license, and a supervisor was called when Latasha could not produce it. The supervisor aggressively questioned Latasha several times as to why she did not have identification, and Latasha entered her therapy session "very defensive and angry."

Viewing the evidence in the light most favorable to the trial court's finding for purposes of our legal sufficiency review and all the evidence equally for purposes of our factual sufficiency review, we hold that the trial court could have formed a firm belief or conviction that Latasha engaged in a continuing course of conduct that endangered the well-being of C.J.S. and S.G.B. based on her repeated use of cocaine while she was pregnant or taking care of a newborn, multiple failures to submit to drug testing, and lack of impulse control. *See In re C.A.B.*, 289 S.W.3d at 885; *see also In re A.I.G.*, 135 S.W.3d 687, 693 (Tex. App.—San Antonio 2003, no pet.) (holding evidence of endangerment due to mother's "inability to control her impulses and cope with anger" legally and factually sufficient to support finding that termination was in best interest of children). Accordingly, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that Latasha engaged in conduct under subsection (E) that endangered the emotional well-being of her children.[10] *See In re C.A.B.*, 289 S.W.3d

---

[10] The Department argued that Latasha engaged in other conduct that endangered the physical or emotional well-being of the children by (1) maintaining relationships involving abuse and violence, (2) allowing the children to be around their fathers who were known drug users, (3) infrequently visiting S.G.B. in the hospital and leaving him there after discharge, and (4) not maintaining psychiatric care. We find these arguments to be without merit. Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child, but the Department did not present any evidence that the children were affected or how they were affected by Latasha's relationships. *See In re A.S.*, 261 S.W.3d 76, 83-85 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Moreover, none of these incidents occurred after Latasha successfully completed domestic violence classes under her plan. *See In re K.D.*, No. 05-97-00589-CV, 1998 WL 106024, at *7 (Tex. App.—Dallas 1998, no pet.) (not designated for publication) ("[G]ood faith adherence to a service plan militates against termination."). Similarly, the Department presented no evidence that Latasha voluntarily allowed the children to be around their fathers at a time when they were using drugs. Cory "took" C.J.S. from Latasha and did not return him for a while, but there is no evidence Latasha voluntarily relinquished C.J.S. In fact, Latasha reported the incident to the Department and tried to get C.J.S. back. Also, Latasha did not live with Sherman, but he would "come by" her place, and his mother babysat C.J.S. while S.G.B. was in the hospital. Latasha admitted at trial that Sherman used drugs, but there is no evidence that

at 885.

## II. Best Interest of the Children

Latasha also challenges the legal and factual sufficiency of the trial court's finding that termination was in the children's best interest pursuant to section 161.001(2).

There is a strong presumption that the best interest of the child is served by keeping the child with his or her natural parent, and the burden is on the Department to rebut that presumption. *In re S.N.*, 287 S.W.3d at 191. To rebut this presumption, there must be clear and convincing evidence of the natural parent's present unfitness. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interest of the child. *In re S.N.*, 287 S.W.3d at 191. In reviewing the sufficiency of the evidence to support the best interest finding, a court examines several factors, including (1) the desires of the child, (2) the present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the persons seeking custody, (5) the programs available to assist those persons seeking custody in promoting the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976); *In re S.N.*, 287 S.W.3d at 191. This list is not exhaustive,

---

Latasha knew this information at the time Sherman was around the children. Finally, the Department did not indicate how S.G.B. was endangered by Latasha leaving him in the hospital past his discharge date or present evidence of how Latasha's failure to maintain psychiatric care endangered the children. Latasha was allegedly diagnosed with bipolar disorder as a teenager, and the only professional in this case qualified to diagnose Latasha initially agreed with that diagnosis, but changed his diagnosis in June 2011 to Bipolar II (mild form), which is a mood disorder. The record does not show how a diagnosis of bipolar disorder or Bipolar II without psychiatric care, standing alone, would endanger the children. Moreover, Latasha testified she had been on medication consistently since the Department took custody of the children, even though she changed medications a few times due to adverse side effects. Her doctor had changed her medication to Depakote in August 2011, which she testified she was taking at the time of trial.

and evidence is not required on all nine factors to support a finding terminating a parent's rights. *Holley*, 544 S.W.2d at 372; *In re S.N.*, 287 S.W.3d at 191. With these considerations in mind, we review the evidence below.

**Desires of the children**. C.J.S. was five-years-old and S.G.B. was almost three-years-old at the time of trial. No evidence was presented regarding their desires with respect to Latasha. Thus, this does not factor into our analysis.

**Present and future physical and emotional needs of the children**. Regarding this factor, we note that the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re D.R.A.*, No. 14-12-00119-CV, 2012 WL 2312711, at *4 (Tex. App.—Houston [14th Dist.] June 15, 2012, no pet.). The goal of establishing a stable, permanent home for a child is a compelling government interest. *Id*. The children had been placed in a foster home for 27 months, a large part of their young lives, at the time of trial. They had been in the same foster home for the entire duration.

The children suffered from frequent ear infections after they were taken into Department custody. They both had tubes surgically inserted into their ears. S.G.B.'s tonsils also were removed and his adenoids were clipped. C.J.S. suffers from "mood disorder and A.D.H.D."[11] At the time of trial, he attended therapy twice a month and visited a psychiatrist once a month. S.G.B. is a "special needs child." Both children were suspended from daycare twice, but C.J.S. was in kindergarten at the time of trial and had not had any problems in school. Both Latasha and the children's foster parents had had difficulty controlling the children's behavior, but the social worker testified that the children had made progress under their foster parents' care. Based on this record, the trial court reasonably could have formed a firm belief or conviction that the children's best interests were served by remaining with their foster parents.

---

[11] A.D.H.D. is an abbreviation for attention deficit hyperactivity disorder. *See* Dictionary.com (Aug. 30, 2012), http://dictionary.reference.com/browse/ADHD?s=ts.

11

**Present and future emotional and physical danger to the child**. To "endanger" means to expose the child to loss, injury, or danger. *Id.* at *5. The endangering conduct does not have to occur in the presence of the child. *Id.* We consider in particular, under the facts of this case, the young age and mental vulnerabilities of the children, as set forth above, along with Latasha's substance abuse. *See* Tex. Fam. Code § 263.307(b)(1), (8) (listing factors in consideration of whether parent is willing and able to provide children with safe environment). We have already held, based on Latasha's substance abuse and lack of impulse control, that there was legally and factually sufficient evidence to support the trial court's finding that Latasha engaged in conduct that endangered the emotional well-being of her children. This factor also supports the trial court's best interest finding.

**Parental abilities**. This factor takes into account the parental abilities of the person attempting to avoid termination. *See In re D.R.A.*, 2012 WL 2312711, at *5; *see also In re U.P.*, 105 S.W.3d at 231. The children lived with Latasha until they were taken into the Department's custody, although C.J.S. lived with his father for a short period of time after Cory "took" his son from Latasha. Latasha attended parenting classes and visited her children "20 or more" times after they were in Department custody, but missed approximately three visits because her car was "broken down." At the time of trial, Latasha was living in a two-bedroom apartment, but did not have a job, although she received Social Security checks and income from medical studies. Latasha testified that seeking employment might jeopardize her ability to receive Social Security disability benefits. There is evidence she took her children to the doctor or to the hospital when they needed medical attention. She took S.G.B. to the hospital on December 15, 2009, but visited him sporadically and was unable or failed to pick him up when he was ready for discharge.[12]

---

[12] Latasha and Sherman stayed at the Ronald McDonald House near the hospital that evening where they got into an altercation and Sherman was arrested for assaulting Latasha. Latasha testified that on December 16, Sherman's mother, who had been watching C.J.S., refused to continue doing so. Thus, Latasha left the hospital to get C.J.S. She did not return until December 18 because C.J.S. had a cold, and Latasha had no one to watch him. She also testified she visited S.G.B. on December 20 and 21. She took the bus each time and had to take C.J.S. even though he was sick. Latasha testified she went to the

12

During visits, Latasha sometimes had a hard time controlling the children, and the social worker had to intervene. Latasha also called the children "stupid" during one of her visits when the children ran out of the office.[13] Some, but not all, of Latasha's visits with the children were chaotic. The social worker was concerned, based on Latasha's interaction with the children and their special needs, that Latasha would be unable to care for the children.

Over the 27-month period that the Department's case had been pending by the time of trial, Latasha was unable to become a self-sufficient parent. One psychologist determined that she "has some limited abilities or adequacy for taking care of herself or taking care of children, young children in particular, on her own" that "would be best suited to being supportive [sic] by another responsible, reliable adult in the picture who can assist with monitoring and making child care decisions." One of Latasha's therapists testified that she should have made more progress over the course of the counseling sessions she attended and thought that "reuniting with her children was a bad idea" at the time her counseling sessions with Latasha ended. Moreover, as set forth above, Latasha's psychologist who testified for her at trial could not recommend that Latasha have managing conservatorship of the children: "I was not making recommendation that the children go home at this time, but I do think that this family needed to have more support to allow the children and the mother to develop community support and to be able to reunite this family."

The family service plan identified several tasks for Latasha to complete. One goal of the plan was for Latasha to provide her children "with a safe environment within a reasonable time" by the plan's target date of December 23, 2010. Based on the evidence

Women, Infants, and Children (WIC) office on December 22 to get milk for S.G.B., was there all day with C.J.S., and thus could not be contacted. The Department took custody of the children that evening. (WIC is part of the United States Department of Food and Agriculture that provides federal grants to states for supplemental foods, health care referrals, and nutrition education for low-income, pregnant, breastfeeding, and non-breastfeeding postpartum women, and to infants and children up to age five who are found to be at nutritional risk. *See* FNS, USDA, *WIC* (Aug. 30, 2012), http://fns.usda.gov/wic.)

[13] Latasha's social worker testified at first that Latasha said, "[C.J.S.] that is dumb or stupid," but later testified, "She was calling [S.G.B.] and [C.J.S.] stupid. She was calling them dumb."

that Latasha had not become a self-sufficient parent by the time of trial in March 2012, the factfinder could have concluded that she did not accomplish this goal by the target date and might never be successful. Another goal of the plan was for Latasha to obtain a psychiatric evaluation and follow all recommendations set forth in the evaluation. The evaluation required Latasha to "remain under psychiatric care for treatment of bipolar [disorder]." At the time of trial of trial, Latasha had dismissed her psychiatrist, although she had contacted another psychiatrist "to resume [her] treatment." Latasha also was required by the plan to "demonstrate an ability to stay sober/drug free" and "submit to random [drug tests] with an understanding that every missed test will be considered positive." As set forth above, Latasha tested positive for cocaine and missed four or five drug tests.

To determine whether Latasha would be an able parent, the factfinder was entitled to consider Latasha's lack of parenting skills with regard to her "special needs" children and her failures to comply with significant aspects of the family plan. *See In re D.R.A.,* 2012 WL 2312711, at *5; *see also In re S.N.*, 287 S.W.3d at 192. This factor also weighs in favor of the trial court's finding that termination was in the best interest of the children.

**Available programs**. This factor takes into account assistance programs available to the person seeking to avoid termination in promoting the best interest of the child. *In re D.R.A.,* 2012 WL 2312711, at *6. Latasha had access to the WIC program to meet the children's dietary needs, along with her monthly Social Security checks. The rent for her tidy, two-bedroom apartment is $168 per month.[14] She also attended a church that offered programs for single parents, daycare, GED classes, and family events. Even with the benefit of all these programs, her psychologist witness testified she was not ready to reunite with her children. This factor also weighs in favor of the trial court's finding.

---

[14] The under-market rent implies assistance of some sort.

**Plans for the Child by Parent Seeking to Avoid Termination or Agency Seeking Custody and Stability of the Home or Proposed Placement.** These two factors compare the agency's plans and proposed placement of the child with the plans and home of the parent seeking to avoid termination. *Id.* Latasha intended to provide for her children through her Social Security checks, income from medical studies, and access to WIC, Medicaid, and food stamps. She found schools and daycares available to the children near her home. She also found programs available to C.J.S. for his A.D.H.D. and mood disorder and found a pediatrician for the children. She had a car at the time of trial. The foster family that had custody of the children for 27 months before trial apparently wishes to adopt them, which is the Department's recommendation. *See In re C.H.*, 89 S.W.3d at 28 (noting evidence about placement plans and adoption are relevant to best interest but must be considered in context of entire record). The trial court reasonably could have formed a firm belief or conviction that the Department's—as opposed to Latasha's—plans for the children were in their best interest.

**Acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate and any excuses for acts or omissions**. We finally consider Latasha's acts or omissions and any excuses for her acts or omissions. As set forth above, Latasha left S.G.B. in the hospital for two days after he was discharged. She explained that she did so because she did not have transportation or anyone to care for C.J.S. Also, she explained that she did not know S.G.B. was ready for discharge and the hospital could not reach her because she was at the WIC office getting milk for S.G.B. Latasha also failed one drug test that she was required to take under the family plan, which showed she had taken cocaine more than once during the 90-day period before the test. She denied having taken cocaine. She missed four or five scheduled drug tests required under the plan, but explained that she did not have transportation to get to the testing facility or she was out of town. The trial court, as the fact finder, was entitled to disbelieve some or all of Latasha's excuses and reasonably could have formed a firm belief or conviction that Latasha had inadequate excuses for these actions.

15

Viewing the evidence in the light most favorable to the judgment for our legal sufficiency analysis and all of the evidence equally for our factual sufficiency analysis, we conclude that a reasonable factfinder could have formed a firm belief or conviction that the best interest of the children would be served by termination of Latasha's parental rights. We therefore find the evidence legally and factually sufficient to support the trial court's finding.

We overrule Latasha's factual and legal sufficiency challenges to the trial court's findings. We affirm the judgment of the trial court.


/s/    Martha Hill Jamison
Justice

Panel consists of Justices Boyce, Christopher, and Jamison.