**Affirmed and Memorandum Opinion filed April 18, 2019.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00952-CV

### IN THE INTEREST OF A.R.G., A CHILD, Appellant

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2016-04728J**

### MEMORANDUM OPINION

The trial court terminated the parental rights of appellant, J.I.A. (Mother), and A.G. (Father) to their daughter, A.R.G. (Alice),[1] and appointed the Department of Family Protective Services (the Department) as the child's managing conservator. Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings on the two predicate grounds and its finding that termination is in the best interest of the child. Father has not appealed. We affirm.

---

[1] We use pseudonyms to refer to appellant, the children, and other family members. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8.

FACTUAL AND PROCEDURAL BACKGROUND

## A. The Department's Investigation

Three months before giving birth to Alice—the child at the center of this parental-termination suit—Mother tested positive for cocaine. Mother was required to submit to random drug testing as a part of her family service plan due to the Department's investigation into Mother's care of her two sons, E.C.A. (Ethan) and A.A.G. (Alex). At the time of Alice's birth, Ethan and Alex were in a kinship placement with their maternal grandmother (Grandmother).

### 1. Ethan and Alex

Mother gave birth to Ethan when she was sixteen years old and at the time of trial Ethan was five years old. Mother gave birth to Alex less than two years after giving birth to Ethan. The affidavit supporting removal of Ethan and Alex was entered into evidence in this case. That affidavit alleges the Department received a referral of Mother's physical neglect of Ethan and Alex, stating the boys appeared pale and weak. The boys had diaper rashes because Mother allegedly failed to change their diapers. The boys had body rashes allegedly resulting from bed bugs. The report further alleged Mother only fed the boys milk and fruit punch, and sometimes the milk was stale. Additionally, the report stated that the home was unclean, smelled like urine, and the couch was soaked in urine. According to the affidavit, Mother left "blunts" containing synthetic marijuana in reach of the children and was believed to have cared for the children while under the influence of synthetic marijuana. The affidavit further states that on a subsequent visit, law enforcement conducted a welfare check at Mother's home and found both the home and the children to be filthy.

Due to these conditions, the Department referred Mother to Family Based

Safety Services and Mother agreed to participate in services and signed a family service plan. The boys were initially placed in separate homes with relatives. Eventually, the boys were both placed in the care of their maternal Grandmother. During the course of the investigation, Mother was evicted from her apartment, and did not have adequate housing for the children. Mother admitted that she previously smoked marijuana, specifically to smoking "kush," or synthetic marijuana, and admitted using synthetic marijuana while the children were in her care.

Mother agreed to a Family Based Safety Services Plan, but did not complete the requirements of her family service plan—including failing to show up for five required random drug tests. Mother failed to stay in touch with the Department and failed to provide documented financial support for her boys.

In January 2016, after months of ignoring the Department and her responsibilities, Mother reached out to the Department when she found out she was pregnant with Alice. Mother told the caseworker that she wanted to complete her services and have the boys returned to her. Mother stayed in contact with the caseworker for another month, before disappearing again, without completing her service plan.

In May of 2016, the trial court ordered Mother to follow the service plan, which included Mother's participation in random drug testing. On the same date the family service plan became an order of the trial court Mother was ordered to submit to a random drug test. Her hair sample tested positive for cocaine.

One year later, the trial court terminated Mother's parental-rights as to Ethan and Alex on grounds of endangerment, abandonment, and failure to complete her service plan, and granted temporary managing conservatorship to the Department. Mother appealed, and the First Court of Appeals issued an opinion reversing the

trial court's judgment terminating Mother's parental rights and remanded for a new trial. *See In re E.C.A.*, No. 01-17-00623-CV, 2017 WL 6759198, at *14 (Tex. App.—Houston [1st Dist.] Dec. 28, 2017, no pet.) (mem. op.). The First Court of Appeals held that Mother's admitted use of synthetic marijuana in addition to her failed drug test provided sufficient evidence that she endangered Ethan and Alex under section 161.001(b)(1)(E) of the Texas Family Code. *Id*. at *8. The court did not find, however, that it was in the boys' best interest to have Mother's parental rights terminated. The court held that while the evidence was legally sufficient to support the trial court's finding on the best-interest determination, the evidence was not factually sufficient to support the best-interest finding and reversed on those grounds. *Id*. at *13.

In its best-interest analysis, the court held that unsanitary conditions and violation of a court order prohibiting unsupervised visitation by mother, were not factually sufficient to support termination. *Id*. In addition, the court explained that a significant consideration was the absence of any plans for the children's future and that the children were doing well in their current placement. *Id*. The court reversed the judgment terminating Mother's parental rights but affirmed the order regarding the Department's conservatorship of the boys. *Id.* at 14. The boys stayed in foster care.

## 2. Alice

Three days after Mother gave birth to Alice, the Department received a report of physical abuse of Alice by Mother. The report alleged that Mother tested positive for cocaine three months before giving birth to Alice, as recounted above. The report noted that Mother tested negative on all subsequent drug tests. The report further alleged that Father is in jail and that there is a history of domestic abuse between Father and Mother. Alice did not test positive for illegal substances

4

when she was born.

Upon being interviewed by a Department investigator, Mother denied using cocaine and claimed to be perplexed regarding her positive drug test results. Mother stated that Father used cocaine and that she could have tested positive as a result of their sexual intercourse. The Department investigator noted in her report that Alice was wrapped in a blanket and sleeping peacefully in her Mother's arms during their conversation. The investigator also spoke with Grandmother who stated she was happy to help Mother with Alice and hoped Mother would do whatever it takes to get Ethan and Alex returned to her custody. Mother voluntarily placed Alice into the care of Grandmother. The trial court awarded the Department temporary managing conservatorship of Alice a month later. Alice and her brothers remained in the care of Grandmother for one year, until the Department discovered Grandmother allowed Mother unsupervised overnight visitation with the children. The Department placed all three children in a foster home after the unsupervised visits were discovered.

### B. Trial

The Department's caseworker, Alisha Matthews, testified that the case regarding Alice began when Alice was born, because Mother tested positive for cocaine while Mother was seven months pregnant. Matthews testified that the Department gave Mother a family service plan and, at the time of trial, Mother had completed all her services. Matthews explained that a component of Mother's service plan was counseling on domestic violence, which Mother completed.

According to Matthews, the Department's goal for Alice is unrelated adoption. Matthews testified that Alice is bonded to her current foster parents and all her needs are met. Ethan, Alex, and Alice are all placed in the same foster home where the foster parents have expressed an interest in permanent adoption. At the

5

time of trial, Alice had been in the foster home for approximately one month and Ethan and Alex had been placed there for approximately two months. Matthews further testified that the current foster parents began visitation with the children before the placements began.

Matthews explained that Grandmother is not a suitable option for Alice because she previously allowed for unsupervised visitation between Mother and the children.

Matthews testified that at the time of trial, Mother was living in her own apartment, for which the Department had a copy of the lease, and Mother had maintained employment as a tax preparer during the pendency of the case. Matthews confirmed that Mother has only tested positive for drugs on a single occasion.

According to Matthews, Father has tested positive for numerous illegal substances throughout the Department's investigation. Father signed an irrevocable affidavit relinquishing his rights to Alice before trial commenced. Father has a criminal history dating back to 2012, which includes burglary of a motor vehicle, evading arrest, and criminal trespass. Matthews confirmed that the father of Ethan has a criminal history dating back to 2009, which includes burglary of a building, possession of a controlled substance, evading arrest, burglary of a vehicle, and assault on a public servant. Upon questioning, Matthews testified that by having these men around as fathers, Mother endangered her children. At the time of trial, Father was incarcerated.

Next, Mother testified. According to Mother, she is in her second year of employment as a tax preparer with the same employer. The only explanation Mother could offer regarding her positive drug test was that she was living with Father at the time of the test and that she may have tested positive due to their

sexual intercourse. Mother adamantly denied using drugs. Mother testified that she requested a new drug test when she learned she tested positive. According to Mother, she completed all her services, has been living in her own apartment for close to a year, and has held a stable job for close to two years. Mother testified she has worked hard to make her life stable, so she could regain custody of her children. Mother admitted to having unsupervised visitation with the children when they were living with Grandmother and acknowledged that was in violation of the terms of her family service plan.

Mother said she never saw Father use drugs, but that she saw him "high" on numerous occasions while they were living together, including while Mother was pregnant with Alice. Mother testified that Father hit her in April and May of 2016, just a few months before Alice was born. Mother testified that she and Father ceased living together in May of 2016. Mother further testified that she never lived with the father of Ethan and that he disappeared from her life when she informed him she was pregnant. Mother explained that she does not want either father of her children in her life because she now realizes they are "really bad influences." Mother admitted she was previously aware of Father's criminal record.

Next, Bruce Jefferies, an employee at the National Screening Center, testified. Jefferies testified that he has received specialized training regarding analysis of drug test results and has been employed by the National Screening Center for twenty-six years. Jefferies explained that in May of 2016 Mother submitted to an "extended opiate hair test" which showed positive results for cocaine usage. Mother took a "zero tolerance hair test" the same day to confirm the results, which also showed positive results for cocaine use. Jefferies testified that Mother took the same tests one month later and the results came back negative for use of illegal substances or alcohol. Jefferies further testified that based on the

timing of the drug tests, and the date of Alice's birth, there is no doubt in his mind that Mother used cocaine twice during her pregnancy. Specifically, Jefferies stated in regard to Mother's cocaine use, "[m]y honest opinion it could have been just a bad decision on a Friday and Saturday. And it was so small of amount that if Mr. Ritter didn't run that second test, the extended opiate—I mean the zero tolerance with exposure it would have ran the same test, may have been 19870N, you might have got a negative." According to Jefferies, it is not possible for someone to pass on positive drug results through sexual contact, as Mother theorized.

The Department next called the Court Appointed Special Advocate Sara Strom. Strom testified that she has been involved with this family since the beginning of the case with Ethan and Alex. Strom believes it is in the best interest of the children for Mother's parental rights to be terminated because Mother has shown consistent poor judgment. Strom testified about one instance where Mother was in the restroom at the courthouse for a hearing in the boys' case and got into a fight with another woman who was pregnant with Father's child. During cross examination, Mother's counsel asked Strom whether she knew that this other woman was not required to be in court that day and had actually shown up at the court house to "address" Mother. Both Mother and the other woman received citations for "mutual combat" as a result of this incident.

Strom further testified about evidence that was presented during the termination hearing regarding Ethan and Alex. Strom explained that there was evidence that while the boys were in Grandmother's custody, Mother, without supervision, took them to visit Father in jail. Storm testified that the trial court ultimately terminated Mother's parental rights to Alex and Ethan in that case, largely due to her violation of the court's order in taking the boys on unsupervised visits.

According to Strom, Alice is currently in a "mature environment" with her new foster parents. She is placed with her two brothers and the foster parents have expressed interest in permanent adoption. Strom testified that Alice is bonded with her foster parents and it would be detrimental to remove her from their home.

After Strom's testimony, the Department rested its case. Mother called Grandmother to testify on her behalf. Grandmother testified that she allowed Mother to take the boys on an unsupervised visit to be with their dying great-grandfather. Grandmother denied any knowledge that Mother was taking the boys to visit Father in jail. Grandmother testified that she has seen great changes in Mother since Alice's case began. Mother has been working hard to complete her service plan and create stability in her life to regain custody of her children.

Next, Officer Alvero Vallejo testified on Mother's behalf. Officer Vallejo testified that he has known Mother for the last nine years through his work with at-risk-youth in the community of Gulfton. Officer Vallejo explained that he has seen Mother mature and change significantly over the last year. He stated that Mother previously made poor choices with regard to the fathers of her children, but that she has since shown improvement by complying with her family service plan. Officer Vallejo does not believe that the Fathers of the children represent a danger to the children because they are incarcerated. Officer Vallejo testified that he does not believe Mother's parental rights should be terminated. According to Officer Vallejo, Mother has always adamantly insisted that she does not use drugs.

After Officer Vallejo's testimony, both sides rested. The trial court indicated it would like to further review the evidence regarding the criminal background of the two fathers before hearing closing arguments, because the Department's counsel argued the fathers' backgrounds helped to prove endangerment grounds. The case was continued for closing arguments to be presented at a later date.

A month later, when the case resumed, the Department asked the court to reopen the case because additional evidence had "come to light." The Department called the Court Appointed Special Advocate, Sara Strom, back to the stand. Strom testified she viewed Mother's Facebook page after trial recessed and discovered evidence indicating that Mother intends to continue her relationship with Father, despite her testimony to the contrary. Strom provided print-outs from Mother's Facebook page that were entered into evidence. One print-out reflects Mother's "relationship status" affirming that she is "engaged." Another print-out shows a post from Mother stating that Father is going to adopt Ethan and expressing her love for Father. Strom testified that this post was made on March 27, 2018—trial commenced March 6, 2018 and resumed April 10, 2018. A third print-out is a picture of Father with the caption, "Free My Husband The Father of my 2 Kids." Strom did not testify as to the dates of the first or last Facebook print-out.

The Department then presented closing argument, requesting the court terminate Mother's parental rights pursuant to Tex. Fam. Code Ann. § 161.001(b)(1)(D) and (E), based on Mother's positive drug tests, Mother's continuing to allow Father around the children when Father was using drugs, and was engaged in criminal activity, and good placement for the children, intended to be permanent.

Counsel for the Department further specified the criminal convictions and drug test results of Father, including the positive results for marijuana and cocaine, and argued that Mother allowed him around the children under those conditions, endangering the children.

Counsel went on to concede that there was no evidence that Father was physically present in Mother's or Alice's life since the time Alice was born. Despite his lack of past physical presence, counsel argued that the Facebook

evidence shows that Mother intends to be with Father when he is released from jail.

Mother's counsel argued the evidence presented by the Department was insufficient to prove the predicate grounds. The guardian-ad-litem testified that while it does appear Mother had made progress on her service plan, her alleged on-going relationship with Father tends to prove that she has not implemented what she has learned into her daily life. The guardian-ad-litem ultimately testified that he concurs with the Department in requesting termination.

The trial court terminated Mother's parental rights to Alice on the two endangerment predicate grounds. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D) and (E). The trial court also found that termination of Mother's parental rights was in Alice's best interest and appointed the Department sole managing conservator. In this appeal, Mother challenges the termination of her parental rights.

### ISSUES AND ANALYSIS

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(b)(1); and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Mother raises three issues on appeal. In her first and second issues, Mother challenges the trial court's findings under sections 161.001(b)(1)(D) and (E). In her third issue, Mother challenges the trial court's finding that termination of her parental rights is in the child's best interest.

### A. *Standard of Review*

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985);

11

*In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Despite the constitutional magnitude of parental rights, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) (stating "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right"). Due to the severity and permanency of the termination of parental rights, the law imposes a heightened burden of proof, requiring clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002).

"Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a termination case, we consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a

reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id*. at 109.

## B. Predicate Termination Grounds

The trial court terminated Mother's parental rights based on its predicate findings under Texas Family Code sections 161.001(b)(1)(D) and (E). Termination of parental rights is warranted under these respective sections if the fact finder finds by clear and convincing evidence, in addition to the best-interest finding, that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
> ***
>
> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D) & (E).

### 1.    Predicate Finding under Subsection E – Endangerment

The trial court found Mother "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." See Tex. Fam. Code Ann. § 161.001(b)(1)(E). "Endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. See *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)

13

(per curiam). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d at 477.

Termination under subsection 161.001(b)(1)(E) must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent. *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re C.J.S.*, 383 S.W.3d 682, 688 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Danger to the child's well-being may be inferred from parental misconduct alone, and courts may look at parental conduct both before and after the child's birth. *Id.*

As a general rule, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re J.O.A.*, 283 S.W.3d at 345. The trier of fact also may consider evidence of domestic violence as evidence of endangerment under subsection (E). *See In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.). Likewise, illegal drug use may support termination under subsection 161.001(b)(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617. A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may

14

support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. *In re E.R.W.*, 528 S.W.3d at 264-65.

The Department provided evidence regarding Mother's endangerment of Alice :

- Mother's positive drug test results for cocaine while she was pregnant with Alice;

- The affidavit supporting termination of Mother's parental rights to Ethan and Alex, which includes Mother's admitted use of marijuana while caring for Ethan and Alex;

- Father's drug use and domestic abuse of Mother while she was pregnant with Alice;

- Mother living with Father while he used drugs and physically abused Mother;

- Mother's admission that she knew of Father's criminal history while living with Father;

- Mother's violation of the court ordered service plan; and

- Evidence of Father's criminal record.

Although, Mother contested the evidence regarding her use of cocaine, and testified that she no longer intended to have Father present in her life, the factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re H.R.M.*, 209 S.W.3d at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003). Furthermore, there was ample evidence weighing against

15

Mother's credibility, including her agreement to complete a service plan with Ethan and Alex, but failure to follow through; her testimony that Father was no longer in her life, which was subsequently controverted by the Facebook postings; and her failure to follow court orders in taking the children on unsupervised visits.

The drug test results show that Mother used cocaine while she was pregnant with Alice and under investigation by the Department regarding her two sons. The possession of cocaine, under one gram, is a state jail felony. Tex. Health & Safety Code Ann. §§ 481.115 and 481.102. Mother exposed Alice to loss or injury by engaging in criminal behavior that could have resulted in her incarceration for up to two years in jail. *See* Tex. Penal Code Ann. § 12.35 (providing that a person guilty of a state jail felony shall be punished by confinement in a state jail for any term of not more than two years or less than 180 days). Mother could have given birth to Alice in a state jail facility as a result of incarceration. While mere imprisonment will not, standing alone, constitute conduct endangering the physical or emotional well-being of the child, it may contribute to a finding that the parent engaged in a course of conduct which endangered a child's physical or emotional well-being. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533-34 (Tex. 1987).

Mother knowingly subjected Alice to a life of uncertainty by taking risks with her own health and that of Alice's in using cocaine while pregnant and living with a man who hit her. A person can overdose, have a heart attack or stroke, and even die from even a small amount cocaine. *See Rodriguez v. State*, 31 S.W.3d 772, 778 (Tex. App.—Austin 2000), *aff'd* 104 S.W.3d 87, 92 (Tex. Crim. App. 2003) (doctor testified that cocaine is a lethal substance and that any amount can cause of myriad of side effects, including death). The potential for overdose or death exposes a child to loss or injury that constitutes endangerment under

subsection (E).

Moreover, Mother chose to live with a man with whom she had a history of domestic violence. Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *In re M.R.*, 243 S.W.3d at 819 (considering the fact that mother "exposed her children to domestic violence," including an incident where mother was "smacked" in front of child, as evidence of endangerment under subsection (E)).

Mother testified that Father came home "high" on at least five occasions while they were living together and while she was pregnant. Mother admitted she was aware of Father's criminal record, but still chose to live with this man while she was pregnant and had her two sons removed from her custody. Further, Mother missed appointments and failed to follow an agreed service plan during the Department's investigation of Ethan and Alex.

Ultimately, Mother's behavior created potential danger for Alice, which Mother consciously disregarded. This lack of concern for Alice's well-being and shirking of parental responsibilities with regard to Ethan and Alex, supports termination under subsection (E). *See In re S.M.L*, 171 S.W.3d at 480.

Because the record contains legally and factually sufficient evidence to support the trial court's finding under section (E), we need not address Mother's arguments that the evidence is insufficient to support the trial court's findings under sections 161.001(b)(1)(D). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest."). We overrule Mother's first and second issues.

## C. Best Interest of Alice

Texas courts presume that keeping children with their natural parent serves the child's best interest. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The Department carries the burden of rebutting that presumption. *Id.* Proof of acts or omissions under section 161.001(b)(1) is probative of the issue of a child's best interest. *See In re S.R.*, 452 S.W.3d at 366. The considerations the trier of fact may use to determine the best interest of the child, known as the *Holley* factors, include:

(1) the desires of the child

(2) the present and future physical and emotional needs of the child;

(3) the present and future emotional and physical danger to the child;

(4) the parental abilities of the persons seeking custody;

(5) the programs available to assist those persons seeking custody in promoting the best interest of the child;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parents' acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d at 230; *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the children with a safe environment). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

### 1. The Desires of the Child

When a child is too young to express his desires, the factfinder may consider that the child has bonded with the foster family, is well cared for in the current placement, and has spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Alice is too young to express her desires, but the Department's caseworker testified Alice is bonded in her current foster home, with her brothers, and with foster parents who want to adopt all three children. Other than the unsupervised visits with Mother in violation of court order, Alice has spent minimal time with Mother.

### 2. The Future Emotional and Physical Danger to the Child

Although Mother testified that she wants nothing to do with Father, the Department presented evidence to the contrary. According to the Court Appointed Special Advocate, the Facebook post stating Mother loved Father was made in between when trial recessed and continued—just shortly after Mother testified in court that she no longer wanted to be with him. The trial court was free to discredit Mother's self-serving testimony and believe that of the court appointed advocate. *See H.R.M.*, 209 S.W.3d at 109 (fact finder is sole arbiter when assessing credibility and demeanor of witnesses). The trial court was free to believe that Alice's future with Mother could involve a life  parental domestic violence and criminal activity.

### 3. The Parental Abilities of the Persons Seeking Custody

The Department's caseworker testified that the foster parents are both teachers, are able to provide financially for all of the children and want to adopt all three of the children. Mother has just found some stability in her life after six years of demonstrated immaturity and poor decisions—including physical neglect of her two sons. Evidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue. *In re*

*M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

### 4. The Programs Available to Assist those Persons Seeking Custody

The Department's caseworker testified that Mother has completed her service plan. However, compliance with a family service plan does not render termination impossible or trump all other termination factors. *Id*. "The elements of a safe, stable, and happy childhood cannot all be reduced to a checklist in a service plan." *Id*. The guardian-ad-litem stated that while he commended Mother for turning her life around and completing her services, he did not think her behavior, specifically her relationship with Father, indicated that she was applying those lessons into her life. While there are programs for Mother, the fact-finder was free to believe that Mother would not make proper use of those programs. *See H.R.M.*, 209 S.W.3d at 109.

### 5. The Plans for the Child by the Individuals Seeking Custody

Mother did not testify what her plans were for Alice. Mother testified that she has worked hard to secure an apartment and a steady job in order to gain back custody of her children. However, there was also evidence that Father might be a part of Mother's future plans for Alice. Father's long criminal history and history of abuse threatens to destabilize the life Mother envisions for herself and her children. Father also voluntarily terminated his parental rights. On the other hand, all three children are thriving in the care of their foster parents who would like to permanently adopt them. Texas courts recognize as a paramount consideration in the best-interest determination the children's need for permanence through the establishment of a "stable, permanent home." *See In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.). Alice is currently in a safe, stable, and potentially permanent home with her foster parents.

20

Despite Mother's seeming turn-around, the totality of the evidence is such that a reasonable factfinder could form a firm conviction or belief that termination of Mother's parental rights is in Alice's best interest, notwithstanding Mother's turnaround and signs of sustained reformation. *See In re M.G.D.*, 108 S.W.3d at 532. Under the current standard of review, the evidence is legally and factually sufficient to support the trial court's best-interest finding.

## CONCLUSION

Having concluded the evidence is legally and factually sufficient to support the trial court's finding terminating Mother's parental rights under section 161.001(1)(E) and that termination is in Alice's best interest, we conclude that the record evidence supports the trial court's judgment. We affirm the judgment of the trial court.


/s/    Margaret "Meg" Poissant
        Justice


Panel consists of Justices Christopher, Hassan, and Poissant.